Arbegust vs. City of Louisville.

CASE 70—PETITION EQUITY—SEPTEMBER 30.

# Arbegust vs. City of Louisville.

APPEAL FROM LOUISVILLE CHANCERY COURT.

1.  Section 15, article 6, of the new charter of the city of Louisville, must regulate the manner in which Arbegust's thirty-one acres of land, within the boundary of the city of Louisville, which is used for agricultural and horticultural purposes, shall be assessed until he voluntarily divide it into squares or lots, or until the city, in the exercise of the right of eminent domain, shall condemn streets through it, when it must pay him for the land condemned, as well as other incidental injuries; and, having determined that the public good requires this, and having compensated him for so doing, this land will be liable to taxation as lots and town property.

2.  When the interest of a suburban population demands local regulations, and the peace, tranquility, and order of the public indicates that such is necessary, the Legislature has constitutional power to so enact, and to tax, in good faith, to uphold local government and give police regulations; but not merely to embrace taxable property for revenue purposes, in order to lessen the burdens of others.

COKE & ARBEGUST,                                          For Appellant;

CITED—

*Act of Feby.* 18, 1864.

*Act of Feby.* 17, 1865, *S. A.,* 722.

*Smith's Statutory and Constitutional Construction, pp.* 439 *to* 879, *sec.* 757.

*Constitution of Ky., sec.* 37, *art.* 2, *sec.* 14, *art.* 18.

*Constitution of United States,* 5th *amendment.*

3 *Met.,* 257; *Hedger vs. Rennaker.*

9 *B. Mon.,* 347; *Cheaney vs. Hooser.*

15 *B. M.,* 499; *City of Covington vs. Southgate.*

4 *Met.,* 295; *Berry vs. Randall.*

*Session Acts,* 1835–6, *page* 289, *sec.* 28.

4 *Gill & John.*, 6; *Canal Co. vs. Railroad Co.*
*Smith's Com.*, *p.* 924, *sec.* 812.
17 *B. Mon.*, 231; *Sharp's ex'r vs. Dunavan.*
2 *Metcalfe*, 557; *Mathers vs. Shields.*
*Act of Feby.* 17, 1833, *Sess. Acts* 1832, *p.* 217.
*Act of March* 24, 1851, *new city charter, sec.* 15, *art.* 6.
*Law Register*, *Sept.*, 1867, *p.* 716.
*Sedgwick on Con. Law, pages* 250, 674.

W. P. BOONE,                                    For Appellee,
                        CITED—
15 *B. Mon.*, 491; *Southgate vs. Covington.*
17 *B. Mon.*, *Sharp's ex'r vs. Dunavan.*
4 *B. Mon.*, 149; *Williamson vs. Commonwealth.*
2 *Met.*, 353; *Mathers vs. Shields.*
9 *B. Mon.*, 330; *Cheaney vs. Hooser.*

JUDGE WILLIAMS DELIVERED THE OPINION OF THE COURT:

Appellant, being the owner of a tract of thirty-one acres of land within the boundaries of the city of Louisville, and desiring to use it for agricultural and horticultural purposes, and not to subdivide it into town lots, denies the legal right of the city to tax it.

The boundaries of the city had been designated by various acts, when, by an act approved February 17th, 1833, the jurisdictional limits of the city were extended one half mile south from the then southern boundary; but with a provision that the real and personal property within this extension should not be subject to taxation for city purposes. By a subsequent act, approved February 22d, 1836, the real estate within this extension was made liable to taxation by the city when the proprietors should lay it off into lots of half an acre or less, and commence sale thereof. Another act, approved March 5th, 1850, more specifically defined the taxable limits of the city, which were kept distinct from the jurisdictional limits.

Appellant's land is situated within this extension, but outside of the taxable jurisdiction. Thus matters stood, when a convention, under proper legal authority, was called to adopt a new city charter, which was enacted and approved March 24th, 1851. The first section of article one of this charter enacts, "that the boundaries of the city of Louisville shall be as at present established by law; and the inhabitants thereof shall be a body-corporate and politic forever," &c.

This section most evidently intended to designate the corporate limits of the city, and had no reference to the taxable district. The boundaries defined and established were those of the corporation.

This construction is manifest, not only by the language of this first section, but also from other sections: section four of article five, in which exclusive jurisdiction in cases of petty larceny is given to the city court "within said city." And in section fifteen, article six, "all tracts of land *within the limits of said city*, not laid off into squares or lots, shall be assessed for taxation by the acre."

These manifest the clearest intention to abolish all distinction between the taxable limits and corporate boundaries of the city. And that this would be the effect of the new city charter seems to have been well understood by the succeeding session of the Legislature, which enacted that nothing contained in this new city charter should be construed so as to "extend the taxing boundary of the city of Louisville beyond the limits fixed by an act approved March 5, 1850." This act of January 7, 1852, of course repealed to that extent the act of March 24, 1851, and restored that of March 5, 1850, and took from the city the right to tax such lands within this extension, save only as provided by the laws previous to

VOL. II—18

the new city charter. Therefore no inference is to be drawn by the non-user of this power; for, whether it, by way of direct repeal, or by enacting a construction and restoring a prior inconsistent statute, the legal effect would be the same, and the power conferred by the new city charter, to that extent, was annihilated.

The taxing powers were thus limited and governed by the statutes of 1850, down to February 18, 1864, when another amendment to the city charter was made, which prescribes, by metes and bounds, "*the boundaries and taxable limits of the city*," and which, with the exception of a small contraction, adopted the corporate limits of the new city charter of 1851, and includes appellant's land.

This act of 1864, like that of 1851, abolishes all distinction between the taxable limits and corporate boundaries of the city; and we are bound to so decide, in the absence of any *legislative enactment declaring it shall be differently construed.*

We are then brought to the direct question as to the constitutional power of the Legislature to authorize this property to be taxed for city purposes.

The population east, west, and north of this land, is sparse for some distance; but on the south and opposite side of the denser population there is a settlement known as California, including residences and business houses, and the population is increasing and encroaching all around.

The object of this extension of the jurisdictional limits of the city, as derived from these various enactments and the extrinsic evidence, was to give local government and police regulations to the then important and rapidly increasing suburban population; and the witnesses concur in the opinion that this was advantageous to appellant as well as the others included.

Arbegust vs. City of Louisville.

The protection of this accumulating border popula-tion, by giving them a local government and the ben-efits of its police regulations, being the real object, and not the mere taxation of their property in order to in-crease the revenues of the city, distinguishes this from that of *Southgate's case*, 15 *B. M.*, 491. That this suburban population have had the benefits of this local govern-ment, with all its incidental advantages, for many years, is certain; and whether the revenue now derived from them would be adequate to discharge the increased ex-penses of the city on this account, remains quite uncer-tain.

The property-holders within the previous taxable limits of the city have assisted to support this local govern-ment, and extended its blessings to the suburban popu-lation for a long time, with commendable patience and liberality; and it is not at all surprising that they should desire that those enjoying its benefits should bear a rea-sonable portion of its burdens; and that this should seem both reasonable and just to the Legislature is but nat-ural.

When in the judgment of the Legislature the interest of a suburban population demands local regulations, and the peace, tranquility, and order of the public indicates that such is necessary, we cannot doubt its constitution-al power to so enact, nor question its power to tax for such purposes the real as well as the personal estate of the people, nor the large as well as the small lots in-cluded therein; for it is more consonant with the entire genius, equality, and justice of our constitution and laws, that each should bear the burdens of that government which protects his person and property according to the worth of his estate, than to discriminate against the small in favor of the large property-holders. But whatever

may be said of the intrinsic justice of such measures, there is no power in the courts to control this when the taxing power is conferred in good faith to uphold local government, and give police regulations to the population, and not merely to embrace taxable property for revenue purpose in order to lighten the burdens of others. And these are the principles heretofore announced and adhered to by this court through a train of decisions, including the cases of *Cheaney vs. Hooser*, 9 *B. M.*, 330; *Sharp's ex'r vs. Dunoven*, 17 *B. M.*, 223; *Maltus vs. Shields*, 2 *Met.*, 553; and *Southgate vs. Covington*, 15 *B. M.*, 291. It is sometimes difficult to determine from the facts whether local government to a population or taxation for revenue purposes be the real incentive to the enactment; but when this is clearly manifested, then the proper application of the principle is not embarrassing.

The act of 1852 restricting the operation of the taxing power, under the new city charter of 1851, to the previously defined taxing limits, being constructively repealed by the act of 1864, leaves the general provisions of the new charter to operate over the entire jurisdictional and taxable limits of the city, hence section 15, article 6, of the new city charter, must regulate the manner in which appellant's property shall be assessed, until he voluntarily subdivides it into squares or lots, or until the city, in the exercise of the right of eminent domain, shall condemn streets through it, when it must pay him for the land so condemned, as well as other incidental injuries; and having thus determined that the public good requires this, and having compensated him for so doing, this land will be liable to taxation as lots and town property.

By requiring lands not laid off into squares or lots to be taxed by the acre, the Legislature manifested a sense

of justice and propriety in permitting the proprietors to exercise their own volition as to the purposes to which they would appropriate their own property; and so long as they should choose not to subdivide their tracts, these should be taxed by the acre, which we understand is to rate them as agricultural lands; but as such, being near a large and important market, their value might be largely over lands of equal fertility more remote; and however difficult it may be to ascertain their precise value as agricultural lands, as contradistinguished from town lots, yet if a palpable abuse in their rating should appear, we cannot doubt that it would be both the duty and pleasure of the proper authorities to interpose.

There is no suggestion in the petition that this land is improperly rated, if subject at all to taxation, and therefore we cannot determine as to this; but if this should be made appear at the proper time, in the proper manner, to the proper authorities, doubtless the error would be corrected.

We have given this case due consideration, having once awarded a rehearing, as some of those local acts were not brought to the view of the court; but we still fail to find a cause to reverse the judgment. Wherefore, it is affirmed.