CASE 32—EQUITY—MAY 30, 1883.

# Louisville Bridge Co. v. City of Louisville.

### APPEAL FROM LOUISVILLE CHANCERY COURT.

1. The commonwealth of Kentucky has jurisdiction over all kinds of property, and the right to the soil under the water, to low-water mark on the northwest side of the Ohio river.

2. There is no limit to the exercise of such jurisdiction, except where it has been delegated to the general government for specific purposes.

3. The bridge of appellants was erected within the boundary of the commonwealth of Kentucky by the permission of the general assembly, and is entitled to and receives the equal protection of the laws of the state.

4. Being within the jurisdiction of the commonwealth, the appellant owners are bound to pay revenue upon their bridge to the state.

5. It is not sufficient to authorize municipal taxation to show that a bridge was built within the corporate limits of the city, for the corporate limits of the city are larger than its taxable boundary.

6. Appellant's bridge is not subject to taxation by the city of Louisville. A city has no power to tax property which derives no benefit from its government.

BULLOCK & ANDERSON, I. & J. CALDWELL, WINSTON, AND WM. LINDSAY FOR APPELLANT.

1. The paramount jurisdiction of the general government over the Ohio river, under the authority to regulate commerce among the states, will no longer be disputed. This jurisdiction has been asserted and exercised at all times, and in every possible mode, demanded by the interests of interstate commerce. With this jurisdiction the state cannot interfere.

2. The jurisdiction of the general government is exclusive, and therefore the jurisdiction of the state of Kentucky for purposes of taxation is necessarily excluded.

3. It never was intended that the navigable rivers of the United States should be burdened with taxation, state or national.

4. The conclusion from these premises is, that neither the general government or the state has any taxable interest in the Ohio river. (Cooley on Const. Lim., 479, 481; 4 Wheat., 481; *Ib.*, 316; 9 *Ib.*, 738; 16 Peters, 435; Commonwealth v. Morrison, 2 Marsh., 80; 1 Woodbury & Minal, 76; Cooley on Taxation, 57, 130; Burroughs on Taxation, 104-'5; 1 Otto, 367; 3 How., 230; Arnold v. Cov. & Cin. Bridge Co., 1 Duvall, 374; 4 Otto, 113; 18 Wall., 5; Louisville v. Commonwealth, 1 Duv., 295-'6; 42 Pa. St., 25; 36 Cal., 230; 47 *Ib.*, 353; 34

*Ib.*, 456; Morrison v. Thurman, 17 B. Mon., 263; 2 Otto, 272; 9 Wheat., 210; 5 Otto, 465; 7 Cush., 84; Cooley on Const. Lim., 500, 591, 594; Covington v. Southgate, 15 B. Mon., 491; Courtney v. Louisville, 12 Bush, 419; 1 Woolworth, 150; 12 How., 316; 10 Wall., 454-'62; 9 Wheat., 169; 5 How., 504, 599; 12 Wheat., 419, 446; 11 Peters, 102, 157; 15 *Ib.*, 449, 511; 4 Wash. C. C., 344, 378.)

5. The assessment is void.

  (*a*) It is in conflict with the laws of the state. (Potter's Dwarris on Statutes and Constitutions, 236; 5 McLean, 179, 290.)

  (*b*) An assessment of part of a bridge is *per se* void. (Applegate v. Ernst, 3 Bush, 648; Eliz. & Pad. R. R. Co. v. Trustees Elizabethtown, 12 Bush, 234.)

  (*c*) The separate assessment of the right of way was necessary, and that being omitted, the assessment is void. (34 Ohio, 42; Wis., 502; Lexington v. McQuillan, 5 Dana, 513; Cooley on Taxation, 259-'60; Dwarris Stat., 742, 749; 15 Ver., 470.)

  (*d*) The property attempted to be assessed is not within the taxable limits of the city of Louisville. (Morrison v. Thurman, 17 B. Mon., 263; Covington v. Southgate, 15 *Ib.*, 491; Courtney v. Louisville, 15 Bush, 419.)

  (*e*) The ordinance concerning taxes, approved May 28, 1875, was published and printed in but one newspaper published in the city of Louisville in the German language, and in such newspaper only on May 30, 1875, which was Sunday, and was printed and published in only one newspaper printed and published in the English language, and in such newspaper only on 29th May, 1875. (Ormsby v. Louisville, 79 Ky.)

T. L. BURNETT, City Attorney, and LANE & HARRISON for Appellee.

1. The Louisville Bridge Company, a private corporation, was created and organized under, and derives its very existence from, the sovereignty of the state of Kentucky; its property is within the jurisdiction and under the protection of the state, and this sovereignty and protection is exclusive of that of all other states and governments. It results that appellant's bridge is subject to taxation under the revenue laws of this state, unless, by reason of the 11th section of the compact with Virginia, it has some exemption.

2. Nothing is this compact gives any exemption from taxation. (5 Peters, 505; 6 McLean, 237; 3 *Ib.*, 226; 1 *Ib.*, 337; 6 *Ib.*, 209; *Ib.*, 70; 18 How., 430; McFerran v. Alloway, MS. Opin., February 27, 1879.)

4. The power to regulate commerce is not at all like that to impose taxes. (Story on Const., 1068; Blackwell on Tax Titles, 164; Cooley on Const. Lim., 210; 19 Wall., 227; 7 Pick., 23; 7 Watts & Sergt., 456;

Louisville Bridge Co. v. City of Louisville.

1 Scam., 70; 13 Pick., 392; 26 Penn. St., 456; 43 N. Y., 290; 36 Cal., 411; 24 Mich., 322; 36 Ill., 9; 40 *Ib.*, 165; 56 *Ib.*, 327.)

5. It is well settled that a municipal corporation charged with the protection of life and property is invested with all the powers of taxation to accomplish the purposes of its creation. (20 Wall., 660; 37 Penn. St., 277; 111 Mass., 460; 25 Wis., 122; 1 Hughes, 282; 1 Duv., 297; 7 B. Mon., 161; 48 Ill., 299; 6 Gill, 391; 7 Cowan, 588; 47 Miss., 492; 6 Ohio St., 604; 1 Wend., 337; 36 Conn., 215.)

6. To arrest the legislation of a free people, especially in reference to burdens self-imposed, is to restrain the popular sovereignty, and should have a clear warrant in the fundamental law. (19 Wis., 624; 50 Penn. St., 150; 13 N. Y., 143; 9 B. Mon., 330; 32 Conn., 118; Commonwealth v. Morrison, 2 A. K. M., 90.)

CHIEF JUSTICE HARGIS DELIVERED THE OPINION OF THE COURT.

The city assessor of Louisville, in August, 1876, without notice to the Louisville Bridge Company, assessed for taxation so much of its right of way and bridge improvements thereon as lies between the north line of the Louisville and Portland Canal and low-water mark on the northwestern shore of the Ohio river.

The assessment was for back taxes, alleged to be due for the years 1874, 1875, and 1876. The assessor fixed the valuation each year at $750,000, but no opportunity of a review of the assessment was alleged to have been given the company by keeping the assessment rolls open the requisite length of time, and giving notice thereof, as required by law.

Upon this assessment, the city of Louisville brought this action in equity against the Bridge Company to subject its right of way and bridge over the water in the Ohio river to the payment of the taxes for those years, and the penalties for the non-payment thereof within the statutory periods. The city recovered the sum of $51,975, the amount of the taxes, and the Bridge Company has appealed from the judgment.

Its counsel insist that this judgment is erroneous, because the bridge and right of way are not subject to state or municipal taxation. Many other questions upon the pleadings, ordinances, manner of assessment, citation, &c., are discussed and urged with force and plausibility, and we might say, as to some of them, unanswerably; but it is unnecessary to decide them, in view of the radical effect of one of the two main questions relied upon by the appellant. We will proceed to discuss those questions.

It is contended that appellant's bridge and right of way described in the petition are not subject to the taxing power of the State of Kentucky, because—

*First.* Of the third clause of section 8, article 1, of the Constitution of the United States, which provides that Congress shall have power "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

*Second.* Of the 11th section of the compact with Virginia, which declares "that the use and navigation of the river Ohio, so far as the territory of the proposed state, or the territory which shall remain within the limits of this commonwealth lies thereon, shall be free and common to the citizens of the United States, and the respective jurisdictions of this commonwealth, and of the proposed state, on the river as aforesaid, shall be concurrent only with the states which may possess the opposite shores of the said river."

The jurisdiction of the state of Kentucky over that part of the Ohio river which marks her northwestern border to low-water mark on its northwestern shore has been so often considered that we had thought the question one of authority; but able and learned counsel, whose views are entitled

to consideration, contend that the question presented by this record is, new, and has never been settled adversely to their position, and we therefore feel that it is our duty to dispose of the question by a review of the history, legislation, and authorities which support the principles applicable to it.

In 1779 Virginia opened a land office, but prohibited the location or entry of any land within her then charter limits, lying to "the northwest side of the river Ohio."

This prohibition must have been made in contemplation of the cession of that part of her territory to the United States.

Preliminary to the cession, congress, on the 6th day of September, 1780, passed a resolution recommending " to the several states having claims to waste and unappropriated lands in the western country a liberal cession to the United States of a portion of their respective claims for the common benefit of the union."

On the 2d day of January, 1781, Virginia yielded to the congress of the United States, for the benefit of the said states, "all right, title, and claim," which she had "to the territory northwest of the Ohio river," subject to certain conditions.   Congress, by an act of September 13th, 1783, stipulated the terms on which the United States agreed to accept the cession of the territory named.   On the 20th day of December of that year, although the terms on which congress agreed to accept the cession did not "come fully up to the propositions of Virginia," that state accepted the terms of congress, and by an act of her general assembly authorized her delegates in congress, by proper deeds or instruments in writing, to convey unto the United States

all her right, title, and claim, "as well of soil as jurisdiction," to the territory lying "to the northwest of the Ohio river." And in pursuance of that authority, Thomas Jefferson, Samuel Hardy, Arthur Lee, and James Monroe, on the 1st day of March, 1784, executed a deed of cession from Virginia to the United States, conveying, the soil and jurisdiction of that territory.

Thus Virginia parted with that magnificent "tract of country" embraced by her charters of 1606, 1609, and 1611–'12, granted by James the First of England; and thus the United States became invested with title to its soil and jurisdiction for the benefit of all the states, including Virginia.

On the 13th day of July, 1787, congress passed "an ordinance for the government of the territory of the United States *northwest of the river Ohio*," in which it was declared "for the prevention of crimes and injuries, the laws to be adopted or made *shall have force in all parts of the district*," the territory then being one district; that "no tax shall be imposed on lands the property of the United States;" that "the navigable waters leading into the Mississippi and Saint Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the said territory as to the citizens of the United States, and those of any other States that may be admitted into the confederacy without any tax, impost, or duty therefor."

The compact between Virginia and Kentucky was made on the 18th day of December, 1789, more than two years after the passage of the ordinance of congress establishing the northwest territorial government, and subsequent to the adoption of the constitution of the United States.

There is nothing in any of the acts, either of Virginia or the revolutionary congress, relating to the cession of the northwest territory to the United States, which conveys, surrenders, or affects the jurisdiction of the state of Virginia over the bank, bed, and waters of the Ohio river to low-water mark on its northwestern shore. The first mention that is made of the navigable waters leading into the Mississippi and Saint Lawrence, and of their character and use, is to be found in the fourth article of the ordinance of 1787, which referred only to such navigable waters flowing into either of those great rivers as laid within or flowed through the territory lying to the northwest of the river Ohio, as that territory so bounded, with the rivers embraced in it, was the subject of the ordinance, and alone conveyed by Virginia's deed of cession.

It is true that the ordinance of 1787 was in furtherance of the then prevalent sentiment of the country in favor of the free and common right of navigation of the Mississippi and the navigable waters flowing into it. But congress had no power then, under the articles of confederation or from the states, to regulate the navigation of inter-state streams outside of the ceded northwestern territory, over whose soil and rivers congress had jurisdiction by the terms of the deed of cession. And until the constitution of the United States was established, delegating to congress the power to regulate commerce among the states, it had no such power over the rivers within the jurisdictional limits of the states; therefore, the commercial clause of the constitution, and the ninth section of its first article, which declares that "no preference shall be given, by any regulation of commerce or revenue, to the ports of one state over another," and the second clause of section 10 of said article,

which says, "no state shall, without the consent of congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws," with their construction by the courts, declare and explain the nature and extent of the jurisdiction of the United States over the Ohio and other navigable waters.

By the decision of the supreme court in Handley's lessee v. Anthony, 5 Wheaton, 374, the territorial limits of Kentucky were authoritatively held to extend to low-water mark on the northwest side of the Ohio river, and her jurisdiction over the soil to lower water-mark affirmatively settled. ·

That jurisdiction extends to all kinds of property situated in the Ohio river, such as islands, or the right to the soil under the water, and there is no limit to its lawful exercise, except where jurisdiction and power has been delegated to the general government for specified purposes, and that of the state expressly or necessarily excluded..

It is said, in the case of McCulloch v. Maryland, 4 Wheaton, 316, that all subjects over which the sovereign power of a state extends are subject to taxation, and the sovereignty of a state extends to everything which exists. by its own authority, or is introduced by its permission; and these principles are recognized in Gibbons v. Ogden, 9th Wheaton, 1, in which it was said the power of taxation is indispensable to the existence of the states, and may be exercised concurrently with the general government, but that there is no analogy between the power of taxation and the power of regulating commerce; and there can be no necessary displacement or assumption of the power to regulate commerce by the states merely exercising the ordinary and essential power of taxation; for unless the

Louisville Bridge Co. v. City of Louisville.

taxes which may be levied by a state for its own lawful pur-poses amount to a regulation of commerce in some way, either by obstructing or otherwise diminishing the free navi-gation of the water-ways over which the commerce of the country is carried, or discriminating in favor of local and against foreign or *ultra* state subjects of commerce, the tax-ing power of the state may be exercised upon all property within its limits which receives the protection of its laws; and the fact that property may be employed in a commer-cial venture, or for commercial purposes, does not sanction its exemption from the common burdens of taxation borne by other property, used in other pursuits of life, for the purpose of ordaining, maintaining, and enforcing the laws.

Burroughs on Taxation, page 93, says the taxing power of the states may be exercised upon all property within their limits, upon the goods carried, or the instruments of com-merce as property, and thus indirectly affect commerce. The text is in accord with numerous decisions.    As the territorial jurisdiction of Kentucky embraces the right of way and the bridge over it, and her power of taxation is so essential and general, where is the limitation to it which will embrace and exempt from state taxation this property?    Its owner, the appellant company, was incorporated and created by authority of the sovereignty of Kentucky, and it was by her permission erected within her boundary, and is entitled, and receives, the equal protection of her laws, and therefore, as we think, subject to taxation as like property situated in any other part of the commonwealth.

The bridge is not an agency or means employed by the federal government to carry any of its powers into effect, but a public way over which commerce is carried, and which belongs to a private corporation having the right to charge

for its use.    The bridge is a public convenience, but it con-
stitutes no branch or part of the general government, and is
not used by it to regulate commerce.    For the purpose of
protecting the free navigation of the Ohio and other inter-
state streams, congress adopted certain rules by which
bridges may be so erected over them as not to obstruct
their use, but it does not follow that because congress,
under its power to regulate commerce, prevents such bridges
from obstructing navigation, that it is employing them as a
means of regulating commerce, or that they are necessary
or proper to that end, any more than their use by those
engaged in commercial pursuits renders it an agency in the
regulation of commerce among the states in the constitu-
tional sense.    The appellant's counsel construct their argu-
ment upon a misconception of the purposes for which the
bridge was built and is used.

The cases of Thompson v. Pacific Railroad Co., 9th Wal-
lace, 590; Railroad Company v. Penniston, 18th Wallace,
29, settle the doctrine that, although railroads, telegraph
lines, manufacturing establishments, and property of cor-
porations are employed by the government to transport its
mails, troops, munitions of war, &c., and used in carrying
on the commerce of the country, they are liable to con-
tribute to the revenue of the state.    Whatever may be the
jurisdiction of the states which possess the opposite shore
of the Ohio river, derived from the compact with Virginia,
to which they were not parties, it does not extend to the
soil covered by the water of that river at its lowest stage,
or to its islands or southern shore; nor does the compact
impose any duty upon or impart any power to those states
to protect property located in or across the river, and within
the territorial limits of Kentucky, as declared by the supreme

court. The subject-matter of the 11th section of the compact is the use and navigation of the river Ohio, and the concurrent jurisdiction of all the states along its shores was provided with reference to that subject, and to insure to them the equal enjoyment of the free use and navigation of the river, which was a recognition and confirmatory of the rights which they enjoyed under the constitution that went into operation before the compact was made.

Not a decision can be found where the jurisdiction of the states, lying to the northwest of the Ohio, and opposite Kentucky, has been held to extend to any island, bridge, or right of way south of low-water mark on the northwestern shore; nor has any of those states, by legislation, claimed such jurisdiction, or adopted appellant's construction of the 11th section of the compact.

As a matter of history, it is known that those states have exercised merely police powers over persons and property along their shores when crafts were attached to them above low-water mark.

This construction by themselves of their jurisdiction over the waters of the Ohio, the long and undisturbed acquiescence in its correctness, and the actual territorial limits of Kentucky to the full extent of which she has, since her admission into the Union, exercised original exclusive jurisdiction over persons and property for all governmental purposes, leave no room to doubt the constitutional and sovereign power of the state of Kentucky to control and tax the appellant's right of way and bridge.

But, although Kentucky has the power to tax this property for revenue purposes, the claim of the city of Louisville to tax it for municipal purposes rests upon a question of constitutional and legislative authority which, before it can

exist in any case, must be preceded by the right of the state to exercise governmental jurisdiction over the subject sought to be taxed, and which cannot be exercised in taking private property for public use without just compensation. The right to tax presupposes governmental benefits, and in case of the exercise of a power of taxation by a municipality, there must appear, as said by this court in the case of Courtney v. Louisville, 12 Bush, 421, "both benefits, actual or presumed, and a town or city population on or near the land creating a necessity, or at least rendering it not unreasonable, that the municipal government should be extended over it."

In this connection the court said, if the land "is not near enough to such population to require municipal government, and the property has not been laid out into lots, and could not be profitably so used, it ought not to be taxed for city or town purposes." The cases of Cheaney v. Hooser, 9 B. Mon., and Covington v. Southgate, 15 B. Mon., support the opinion, and lay down and discuss the general principles applicable to the subject.

The agreed facts show that the bed of the river, over which the part of the bridge sought to be subjected to municipal taxation is erected, cannot possibly be laid off into town lots or streets, and that the city of Louisville, whose corporate limits include the Ohio river to low-water mark on the northwestern shore, has no right, if it were physically possible, to lay out the bed of the river into lots or extend its streets into it, because it would obstruct its free navigation and appropriate the river to purposes which nature never intended, and the corporate limits of the city were not extended to effect.

Louisville Bridge Co. v. City of Louisville.

The appellants can never use their right of way as city property, and cannot receive any profit from it merely as such. It also appears that the municipal government of Louisville does not light the bridge with gas or lamps at night; it furnishes no police force for its protection from the city population; and, in fact, performs none of those acts necessary and usual in protection of property which requires municipal government. It is true, on one occasion the city's police, in conjunction with the militia, were called out to protect the bridge from a mob, but this was not because the bridge was taxable city property, but because it was within the State of Kentucky and entitled to the protection of her laws, and furnishes clear proof, by its exceptional occurrence, of the construction which the city authorities placed upon the character of this property.

It is not sufficient, to authorize municipal taxation, to show that the bridge was built within the corporate limits of the city, for the corporate limits may be, and in this instance are, larger than the taxable boundary of the city. At the time the bridge was built the real estate, the bed of the river, could not be subjected to city taxation, and it remains exempt from that power. If, therefore, the appellee's claim to tax the bridge be adopted by the court, the anomaly in law and to common sense will appear that immovable and permanent buildings erected upon the soil, and considered in law as a part of it and as real estate, may be taxed, although the soil and all beneath it, and the use of the waters which flow over it, are constitutionally exempt from municipal taxation. This rule cannot be logically applied to permanent buildings on dry land, and it will not be adopted as to buildings erected on lands covered by water.

Louisville Bridge Co. v. City of Louisville.

If, because the bridge would never have been built but for the proximity of the city, it may be taxed, then every line of railroad passing through the city, which was an inducement to its location, may be subjected as far beyond the population and necessity of municipal government as the legislature can be induced to extend the corporate boundaries of the city. So, on the same principle, so much of all the wharves and structures that may be built out into the river beyond low-water mark from the Indiana shore would be subject to city taxation. The ferry-boat owned by a citizen of Indiana, tied to her shore at the lowest water, would be subject to assessment, because he might never have built it but for the city of Louisville, which furnishes him the life of his business. If all property is to be taxed because it is profitable to own by reason of the patronage of the city, then we can see no escape for suburban property, which, it is well known, gradually declines in value as its distance from the city's population increases. Where, then, would the supposed corresponding benefits of the city's patronage cease? To answer this question would be the ceaseless work of litigation, fomented by unnecessary extension of municipal boundaries for the embracement of taxable subjects.

The necessity for extending the municipal government over the river was not to protect the property on the river, as contended by appellee's counsel, but to catch fugitives who commit offenses in the city of Louisville, and flee across the river to get beyond her jurisdiction. The extension of the boundary was proper on account of this police necessity; but the object of the legislature in making the extension of the city's boundary for the protection of her citizens and property from criminals ought not to be misin-

Louisville Bridge Co. v. City of Louisville.

terpreted, and made the pretext of unjustly taxing property situated beyond the population of the city, with neither actual nor presumed benefits from its municipal government, and not susceptible of ever becoming a part of the city so as to be near to, occupied, or surrounded by its population residing on lots adjoining it.    It is not enough either that the bridge is a "very valuable property" to subject it to this long delayed assertion of the municipal taxing power over it, which, had the city authorities believed to exist, would have been insisted upon long since.    While this delay would not of itself bar a recovery, it throws considerable light upon the nature of this right of way and bridge, and the relationship which they bear to the population, government, and duties of the city.

If the 6th section of the act of March 3, 1871, was intended to embrace the way and bridge described in the petition as subject to municipal taxation, it is to that extent unconstitutional and void.

Wherefore, the judgment is reversed, and cause remanded, with directions to dismiss the petition.

Judge PRYOR delivered the following separate opinion:

The principal opinion in this case proceeds on the idea that, upon the agreed state of facts, the corresponding benefits, actual or presumed, to the property are not such as authorized the imposition of the tax sought to be recovered. It appears that the bridge company, for several years, listed all of its property for taxation that it supposed was liable, or rather, it was assessed by the city, and the taxes paid. The bridge structure and right of way seems to have been omitted, and the city authorities regarding that part of the property as subject to taxation by the municipal govern-

ment, valued it at $750,000, and are seeking in this action to enforce its lien for back taxes for three years, amounting in the aggregate to $51,975.

That this structure may be taxed by the state for revenue purposes there is no doubt, but when proceeding to tax it for municipal purposes on account of benefits received, it presents a different question. The structure rests on the Kentucky and Indiana shore, and so much of the ground owned by the company and its property as lies between low-water mark on the Kentucky side, or the northern boundary of the canal, and the city of Louisville proper, is already taxed, or if not, is conceded to be subject to taxation. It is argued that the bridge is an entirety, and no imaginary severance can be made of it in determining this question, and that, if a part is liable, the whole structure should be taxed. The bridge extends over the soil of Indiana, and beyond the jurisdiction of this State, and the severance must be made at low-water mark on the Indiana side, or the state of Kentucky permitted to tax property outside of the state limits. In making, therefore, a part of the bridge liable, if the legislative intent was to omit the structure, I see no reason why the taxation should not be confined to the land and improvements on the Kentucky side of the river, or only so much of it as is found within the taxable boundary of the city.

When you leave the shore at low-water mark, and attempt to tax the structure from that point to the Indiana shore upon the facts conceded in this case, you might, for the same reason, tax an island in the middle of the river for no other reason than its proximity to the city, and because the city boundary extends to low-water mark on the opposite side. This extension of boundary was only intended to

enlarge the police jurisdiction of the city, and not to make that taxable on the river that otherwise would not be. the subject of taxation. A bridge connecting two cities may be so located and used as to subject the entire structure, so far as the jurisdiction of the state extends, to local taxation, but located as this bridge is, and considering the benefits received, it is manifest that it was not the intention of the law-making power that the structure should be taxed, or the company made bankrupt by imposing upon it such heavy burdens. It is but a continuation of the line of railroads running to and through the city of Louisville, upon which much of its greatness and prosperity depends, and the framers of the act of 1871 did not contemplate the taxation of this bridge, as it is now attempted to be taxed by the city.

The sixth section provides "that all railroad depots, depot grounds, machine shops, and improvements, as well as all the property of bridge companies, express and transfer companies, within the corporate limits of said city, shall be assessed and subject to taxation at their fair value, as of the tenth of January of each year, for all city and school purposes."

The city authorities construed this section in failing to impose the burden for five or six years upon more of the bridge property than is conceded is liable for taxation. Their failure to tax such a structure, if liable, could not have escaped the attention of the able and vigilant officials supervising the financial affairs of the city government. The structure and railway track of a railroad company is certainly not embraced by the act, and if not, I cannot see how the extension of the track upon the wooden bridge is to be made liable upon any fair and just construction of the

provisions of the section under which the power to tax is asserted.

If an island in the river could not be taxed, although the owner had free access to the streets, and was incidentally benefited, as in the case of Courtney, reported in 12 Bush, why should the wooden structure, deriving no other benefit, be required to assume the burden? You discriminate between the corporation and the citizen, taxing the one and exempting the other, and this view, no doubt, controlled the construction given this section for so many years prior to the institution of this action.

I do not mean to say, nor do I understand the principal opinion to decide otherwise, that such a structure might not, by reason of the character of its use, its location, and the benefits resulting to it from the local government, be made the subject of municipal taxation. It might become as indispensable as the streets of the city, and its protection and preservation by the city government rendered absolutely essential, but when considering the legislative enactment under which this power is claimed, the location of the structure, its use, and the benefits said to be derived by it from the city government, such taxation, in my opinion, cannot be rightfully asserted.

I therefore concur in reversing the judgment below.

Judge LEWIS delivered the following dissenting opinion:

Section 6 of the act to amend the charter of the city of Louisville, approved March 3, 1871, under which a portion of the bridge property of appellant was assessed for municipal taxation for the years 1874–'5–'6, is as follows: "That all railroad depots, depot grounds, machine shops, and improvements, *as well as all the property of bridge companies,*

Louisville Bridge Co. v. City of Louisville.

*express and transfer companies*, within the corporate limits of said city, shall be assessed and subject to taxation at their fair value, as of the tenth day of January of each year, for all city and school purposes."

As the question is raised whether the act embraces the property attempted to be made subject to taxation, it is proper that the scope and meaning of it be determined before passing upon its validity.

It is clear that the legislature intended by the act to subject to municipal taxation certain kinds only of property within the city limits belonging to railroad companies, which were enumerated; while certain other kinds, such as tracks, rolling stock, &c., were not enumerated, because intended to be exempt from such taxation.

It would seem that if it had been the intention to exempt any kinds of property belonging to bridge, express, or transfer companies, it would have been indicated in the same manner and at the same time; but instead, language was used in regard to their property so comprehensive, and in such contrast to that applied in the same sentence to property of railroad companies, as to forbid the conclusion that such exemption as is contended for was intended.

It is, however, argued that the following rule of construction is applicable: " When general words follow particular words, the rule is to construe the former as applicable to the persons and things particularly mentioned."   But as bridge companies do not necessarily, nor express or transfer companies ever require railroad depots, depot grounds, machine shops, and improvements, nor any property of like kind, the rule cannot apply.   To attempt to apply it would involve the absurdity of making the phrase, "all the property of bridge companies, express and transfer companies,"

signify all the property of bridge companies, except their bridges and ways over which they are built, and of rendering it meaningless when applied to express and transfer companies.

It is not to be presumed, nor does the language used warrant the assumption, that such abortive legislation was intended. In my opinion, all the bridge property of appellant within the city limits is embraced by the act, and should be now so treated, notwithstanding the delay in assessing it for taxation.

It being conceded in the opinion of the majority of the court that legislative power exists to subject to taxation for state revenue purposes all appellant's bridge property within the territorial limits of the state, what I shall say will relate to the question of the constitutionality of the act of 1871, which subjects all of the same property within the territorial limits of the city of Louisville to municipal taxation; and to properly determine that question, it is necessary to ascertain the character of the property, and its situation and relation to the city.

By an act of the general assembly, approved March 10, 1856, certain persons therein named were constituted and declared to be a body-corporate, under the name of "The Louisville Bridge Company," with all the rights and power necessary for the construction of a bridge across the Ohio river, *extending from some convenient point within the corporate limits of the city of Louisville* to some convenient point on the Indiana side of the river opposite to the city, and also to purchase or condemn and hold so much real estate as might be necessary for the site of the bridge, or the sites of the piers, abutments, toll-houses, and suitable avenues to the same, and such other lands as might be necessary.

Louisville Bridge Co. v. City of Louisville.

By an act approved February 19, 1862, it is provided that the charter of ''The Louisville Bridge Company,'' approved March 10, 1856, be revised and confirmed to James Guthrie and his associates, as successors to those named in the charter, and that they be vested with all the power and rights conferred by the charter, &c.

By virtue of these two acts, appellant exists as a corporation, and in the exercise of the power and rights conferred thereby, acquired the necessary land for the purpose, and in the year 1870 completed the bridge mentioned at a cost of about two million of dollars.

From an agreed statement, the following additional facts bearing on the question appear :

*First.* The entire length of the bridge is 5,294 feet; of which 821 feet is within the state of Indiana north of low-water mark ; 4,076 feet extends from the north line of the Louisville and Portland Canal over the bed of the river to low-water mark on the northern bank, and is within the corporate limits of the city of·Louisville, as defined by an act of the general assembly, approved March 9, 1868; and 397 feet is south of the north line of the canal, and likewise within the corporate limits of the city.

*Second.* The bed of the river over which the bridge is erected cannot be laid off into streets, nor occupied as places of residence, nor can it be used as a passway from any part of the city to any other part. But during the lowest stage of water, the duration of which varies yearly from two to five months, numerous persons are engaged in quarrying and transporting rock from the bed of the river on railway tracks passing under the bridge.

*Third.* Appellant patrols its bridge day and night by its own officers, and does not, and never has, required or received any assistance from the police force of the city between the north line of the canal and low-water mark on the Indiana shore. Appellant has no use for the city police; has at its own expense erected a structure immediately over the Kentucky chute of the river, which is used and occupied by its own employés to guard said bridge, and secure the safety of persons and trains passing over it. But on one occasion, during the riots in 1877, the mayor directed the police force of the city of Louisville, together with citizen soldiers and militia, to, and they did, enter on and guard the bridge structure.

*Fourth.* That the bridge of appellant is used for foot passengers, and upon it is a track over which railroad trains pass.

*Fifth.* That the bridge structure north of the north line of the canal was not assessed for taxation for either the years 1874–'5–'6 until August, 1876, and that portion south of the north line of the canal has not been assessed.

It thus appears that the property of appellant sought in this action to be made subject to municipal taxation, is that part of the right of way and the bridge structure between the north line of the canal and low-water mark on the northern bank of the river, and is described in the assessor's list as the right of way and bridge improvement thereon, conveyed May 28, 1867, by Rowan's executors and devisees, and June 5, 1867, by Lytle's executors, &c., the assessed value for each year being seven hundred and fifty thousand dollars.

It further appears, that of the amount to be levied and collected according to the assessment, one fourth of one per

Louisville Bridge Co. v. City of Louisville.

cent. was to be applied to the city schools, which constitute a part of the common school system of the state.

Why that part of the bridge and right of way south of the north line of the canal was not assessed as a part thereof, and at the same time the part north of that line was, does not appear. The omission, however, does not affect the question of the constitutionality of the act of 1871, nor afford appellant any ground of complaint, for the whole bridge structure, together with the right of way that is within the corporate limits of the city, is subject to municipal taxation, or else no part is subject. All the parts are necessary and indispensable to make an entire bridge, and neither that part north or that part south of the north line of the canal can be taken from it without rendering useless the entire structure. But yet, while the bridge must be regarded as an entirety and inseparable, appellant has no more right to complain that less than the whole has been assessed than if the whole had been assessed at less than its actual value.

Referring to the spirit with which the judiciary should always consider a question involving the validity of an act of legislation having the force of law, and the rule which should control in the determination of it, Justice Washington, in the case of Ogden v. Sanders, 12 Wheat., 270, said: "It is but a decent respect due to the wisdom, integrity, and patriotism of the legislative body by which any law is passed, to presume in favor of its validity until its violation of the constitution is proved beyond all reasonable doubt." And this rule is peculiarly applicable in considering the validity of tax laws; for taxation is essential to the existence of government, and while the power may not be arbi-

trarily exercised, it extends without constitutional restraint to every subject of taxation within the limits of the state.

The constitution of the state was framed with municipal corporations in view, and they are recognized in it as parts of the governmental machinery, and are necessary auxiliaries in carrying out the ends of government.

In the language of this court, "The city of Louisville, to the extent of jurisdiction delegated to it by its charter, is but an effluence from the sovereignty of Kentucky, governs for Kentucky,. and its authorized legislation and administration of law are legislation and administration by Kentucky through the agency of that municipality." (City of Louisville v. Commonwealth, 1 Duvall, 295.)

But for the support of such local government, the burden of taxation must be imposed upon persons and property rightfully within its jurisdiction, in addition to that borne in common with those outside its limits, for the direct support of the state government; and the object of the act in question was to impose upon the bridge property of appellant within . the limits, but not by the terms of the charter of the city before subject to municipal taxation, the same burden as that borne by other real property therein.

I am unable to perceive what clause of the constitution, or how the spirit of that instrument, has been violated by the act.

The only clause suggested is that part of section 14, article 13, which declares: "Nor shall any man's property be taken or applied to public use without the consent of his representatives, and without just compensation being previously made to him."

In the case of Cheaney v. Hooser, 9 B. M., 330, this court, speaking of the manner and extent to which that clause can be applied to local taxation, said:

Louisville Bridge Co. v. City of Louisville.

"It must be obvious . . . that the clause in question was not intended to exclude or even restrict the ordinary power of general or local taxation inherent in the legislative department of the government, and that there must necessarily be vested in that department a wide range of discretion, not only as to the objects for which a tax, general or local, may be enforced, as to which its judgment would seem to be conclusive, but also as to the particular subjects or species of property which shall be liable to taxation, and as to the extent of territory within which a local tax shall operate."

And in regard to the limit of that discretion, said :

"That limit can only consist in the discrimination to be made between what may, with reasonable plausibility, be called a tax, and for which it may be assumed that the objects of the taxation are regarded by the legislature as forming a just compensation, and that which is palpably not a tax, but is under the form of a tax, or in some other form the taking of private property for the use of others or for the public without compensation. Exact equality in the distribution of public burdens, and especially of such as are local, is perhaps unattainable, and cannot form the test of the distinction referred to. There must be a palpable and flagrant departure from equality in the burden imposed upon the persons and property bound to contribute, or it must be palpable that persons or their property are subjected to a local burden for the benefit of others, or for purposes in which they have no interest, and to which they are not therefore justly bound to contribute. The case must be one in which the operation of the power will be, at first blush, pronounced to be the taking of private property without compensation, and in which it is apparent that the burden is

imposed without any view to the interest of the individual in the subject to be accomplished by it."

· The question involved in that case was as to the power of the legislature to extend the corporate limits of a city or town, and to include and subject to municipal taxation persons and property not before subject. The same question arose in the cases of Sharp's ex'r v. Donovan, 17 B. M., 223; Maltus v. Shields, 2 Met., 553; City of Covington v. Southgate, 15 B. M., 491; Arbegast v. City of Louisville, 2 Bush, 271; Swift v. Newport, 7 Bush, 37, and Courtney v. Louisville, 12 Bush, 420. And though in some of these cases the validity of the law extending corporate limits was sustained, and in others not, the principles announced in Cheaney v. Hooser were in all approved, and the same rules for determining the validity of such laws adopted in all.

In the case of Maltus v. Shields, where the law was sustained, the court held that where the persons brought into a town had nearly all the advantages which actual citizens derived from its business, improvements, institutions, and its good government, no such flagrant case is presented as authorizes the conclusion, at first blush, that the taxation imposed was the mere taking of private property for public use without compensation.

In the case of Courtney v. Louisville, referred to in the opinion of the majority of the court, where the law was held invalid, the court said: "Something more than benefits is necessary to warrant that character of taxation. There must be both benefits, actual or presumed, and a town or city population on or near the land creating a necessity, or at least rendering it not unreasonable that the municipal government should be extended over it; but if, considering the

location of the property with respect to actual population, it plainly appears that it is not near enough to such population to require municipal government, and the property has not been laid out into lots, and could not be profitably so used, it ought not to be taxed for city or town purposes."

Of course the converse of these propositions must be taken as true; and being so, it follows that in all cases where city or town limits are extended, if those embraced by the extension are actually or presumptively benefited, and a town or city population is on or near the land creating a necessity, or rendering it not unreasonable that a municipal government should be extended over it, the law imposing such taxation is valid.

I do not understand the court in that case to have decided, as has been suggested, that real property embraced in an extension of city or town limits could not be lawfully subjected to municipal taxation, unless laid out into streets and town lots, or adapted for such purposes. That the court did not in that case intend to prescribe such a test is shown in the reference therein made to the case of Robinson v. City of Louisville. Robinson was the owner of a parcel of land containing twenty acres or more, which was held by this court liable to municipal taxation though not laid out into lots. And referring to that case, this court said that "the facts showed that whatever might be the uses to which Robinson's land was applied, it was more valuable as city property than for any other use, while the facts in this," Courtney's, "case show that appellant's land cannot be sold out in lots at remunerative prices, and is more valuable as agricultural land."

What the court in that case obviously intended to decide, and did decide in that regard, was, that land adapted, used,

and valuable only as agricultural land, and so situated as not to require or derive direct benefits from the city government, or from its improvements, should not be subjected to municipal taxation.    To have decided otherwise would have been in conflict with all the cases referred to.    As said by the court in Maltus v. Shields, whether the land made subject to municipal taxation is used for one purpose or another, is wholly immaterial.    The law has fixed a more certain and less fluctuating test for determining so important a right as that of local or municipal taxation.

If such test be applied, private parks and gardens, peculiarly valuable because they contain large areas of land not divided into lots, would be exempt.    The lands of railroad companies, and of many manufacturing companies, necessarily in large bodies that cannot be advantageously divided, and canals, street and elevated railways, and many other species of real property not at all susceptible of division into streets and lots, would all be exempt.

But this is not the case of real property brought against the will of its owner under the taxing power of a city or town by an extension of corporate limits.    Nor does the question properly arise whether it is or not reasonable that municipal government should be extended over it.    On the contrary, by an express provision of its charter, appellant's bridge was required to be located *at a point within the corporate limits of the city of Louisville,* and extend therefrom to the opposite side of the river; and 394 feet of the bridge, with its appurtenances, has been actually built within the limits as they existed when the charter was granted; and 4,076 feet of it, being the residue within the limits of the state of Kentucky, has been built within the limits established by law in 1868, two years before its completion.

Appellant having thus elected to build its bridge with-in the limits of the city, and availed itself of the right con-ferred by the charter to appropriate for the construction and enjoyment of its corporate property the necessary land situ-ated therein, whether property of individuals, or streets and alleys dedicated to the use of the city, is now precluded, in justice and in law, to claim exemption from taxation imposed upon other property in the city.

Cases have been passed upon by this court where local taxation was held unlawful because persons and their prop-erty were against their will included in an extension of city or town limits, and subjected to taxation for the benefit of others, and for purposes in which they had no interest.   But no case can be found where the imposition of municipal taxation upon property, either personal or real, voluntarily brought or built up by its owner within corporate limits already established by law, was held to be a violation of the constitution.

The bridge of appellant was located with a view to the population, the business, and local government of the city of Louisville, and, it is manifest, never would have been built but for the benefits and advantages afforded by its relative situation.

As a toll bridge, it is valuable in proportion to the popu-lation and business of the city; and as a railroad bridge, it would be valueless without the right to occupy the streets of the city, and other land situated within the city limits. It is especially valuable as a connecting link between north-ern and southern railroads concentrating on opposite sides of the city.   But the two systems could not be connected without the passage of trains through the heart of the city along its public thoroughfares, to the injury and inconven-

ience of citizens and displacement of other business. It is so situated as to have the benefit of water-works, gas, and electric lights, street railways, and all the other advantages and conveniences incident to a city.

It has the benefit of sewerage and of streets and avenues leading to the entrance of the bridge, and to the offices, depots, &c., connected therewith, all provided and kept in repair at the expense of the city government, and all indispensable to the full enjoyment of appellant's property.

Its officers and employés, if not owners, reside in and have the benefit of the institutions, the improvements, and the government of the city.

In addition to the actual benefits thus received, the bridge property of appellant has as accessible, and in as full measure as is enjoyed by any other property within the city limits, the protection afforded by the fire and police departments kept up at the expense of the city government; and that the bridge property of appellant requires the efficient and ready protection afforded by trained policemen at hand, would be obvious without reference to the riot mentioned in the agreed statement of facts by which its destruction was threatened.

It may be true that appellant employs men to guard its property. So do bankers, merchants, and other owners of valuable city property peculiarly liable to depredation and destruction by fire, employ private policemen. But that fact has never been held a sufficient reason for exempting them from municipal taxation.

Thus appellant has for its bridge, which is in a part of and dependent upon the city, the protection and benefits of the municipal government enjoyed by natural persons residing therein, and, in addition, the extraordinary privilege under

its charter of appropriating and using both private and pub-
lic property within the city limits for the better enjoyment
of its own.

Why, then, should this court declare a solemn act of leg-
islation void as to appellant, the effect of which is simply to
require it to bear its ratable share of the burdens of that
municipal government?

. It is contended that, as the land spanned by that part of
the bridge north of the north line of the canal can never be
laid out into lots and streets, and consequently cannot be
subject to city taxation, that it would be anomalous that
immovable and permanent buildings erected thereon should
be taxed.

It has been shown that the adaptability of real property
to be laid out into streets and lots has never before been
held by this court as a test of its taxability for municipal
purposes.

It is true the land between the north line of the canal and
the Indiana shore is, for the most part, covered with water,
and only used as a stone quarry; but even if it was entirely
valueless for every other purpose, it is certainly valuable as
a foundation upon which the piers of the bridge structure
rests, and that it possesses a market value is shown by the
conveyances from the heirs and devisees of Rowan & Lytle.

The bridge of appellant being useful and valuable to its
owner, possesses a taxable value without regard to the state
or conditon of the land upon which it rests, and should be
assessed and made liable to municipal taxation, just as
property in ferries, which it takes the place of, is lawfully
subject.

If the bridge of appellant is to be regarded as not subject
to municipal taxation because the land upon which the piers

rest for their foundation is not subject, for the same reason it would be exempt from all taxation; and if any part of appellant's bridge within the corporate limits of the city of Louisville be exempted from municipal taxation, then all bridges, without regard to their size, are likewise exempt; for the rule that exempts appellant's bridge cannot be relaxed, much less changed, so as to subject others.

And as a result of the ruling in this case, there will be a vast aggregation of capital invested in bridges built across the Ohio river and other water-courses in the state, amounting to many millions, in the hands of corporations receiving all the benefits and protection of municipal governments conferred upon other property, yet exempt from the burdens.

The constitutional power of the legislature to subject bridges situated in towns and cities to municipal taxation has never before been denied by this court, nor has a single case been cited where it has been denied or even called in question by any court in the United States.

Being unable to see in what manner the clause of the constitution referred to is violated by the act of 1871, but clear in my conviction that the logical consequence of the opinion of the majority of the court will be to confer upon a large class of men exclusive separate public emoluments or privileges in violation of section 1, article 13, of the constitution, I feel it my duty to dissent from that opinion.