KAYSVILLE CITY, APPELLANT v. E. P. ELLISON, RESPONDENT.

TAXATION — POWERS OF MUNICIPALITY — LEGISLATURE — PRIVATE PROPERTY INCLUDES MONEY—SEC. 22, ART. 1, CONST.

*Taxation—Powers of Municipality—Legislature.*
  A municipality has no power to collect a tax upon property or business situated so that it cannot receive any protection or benefit from it; and the legislature cannot extend or maintain the limits of a city for such purpose and which has such an effect.

*Private Property Includes Money—Sec. 22, Art. 1, Const.*
  Sec. 22 of Art. 1, of the State constitution is a limitation on Legislative authority and embraces all kinds of private property including money.

(Decided December 8, 1898.)

Appeal from the District Court of Davis County. Hon. H. H. Rolapp, *Judge.*

Action by the City of Kaysville against defendant Ellison for carrying on a business as merchant without a license. Action was begun in justice's court, where Ellison was convicted. Appeal was taken to the district court and upon a trial *de novo* defendant was acquitted. From which judgment of acquittal plaintiff appeals. *Affirmed.*

*E. B. Critchlow, Esq.*, for appellant.

We are aware that there are cases which hold that a city has no power to tax for general city purposes, agricultural lands. The better rule, however, and one which leaves the regulation of these matters where it should be left, in the legislative branch of the government, is that enforced in *Kelly* v. *Pittsburgh*, 104 U. S., 78, and the considerations which control in that case as laid down by Justice Miller, are equally controlling here. Kentucky under a new constitution essentially like ours, has repudiated the old rule and now holds that all lands within city limits are taxable by the city regardless of the question of protection or benefits. *Broad* v. *Scott*, 42 S. W., 104; *Broad* v. *Rarick*, 43 S. W., 450.

The court has recently expressed itself as favoring the same doctrine. *Shepard* v. *Kaysville*, 52 Pac. 592; *Ogden* v. *Crossman*, 52 Pac. 988.

We have here a case of an exercise of power by a municipal corporation under a grant specific in its terms, which power is expressly conferred by laws ratified and adopted by the people of the State in adopting the constitution. Constitution, Art. 24, Sec. 3; *State* v. *Norman*, 52 Pac. 986.

The power of the city to pass the ordinance in question is given by the terms of 1 C. L., 1888, Sec. 1755, Subd. 9 and Subd. 37.

"Although the proposition that the legislature of a State is alone competent to make laws is true, yet it is also settled that it is competent for the legislature to delegate to municipal corporations the power to make by-laws and ordinances, with appropriate sanctions, which, when authorized, have the force, in favor of the municipality and against persons bound thereby, of laws passed by the

legislature of the State." 1 Dill. Munic. Corp., (4th ed.) Sec. 308; *Eureka City* v. *Wilson*, 15 Utah, 53.

Our constitution expressly gives to the legislature power to impose taxes based upon occupation and licenses. Constitution, Art. 13, Sec. 12.

*Messrs. Brown & Henderson* for respondent.

The case of *Ellison* v. *Linford*, 7 Utah, 166, definitely settled the law that the City of Kaysville had no jurisdiction over this defendant, nor power to collect taxes from him, nor any person situated as he was.

When the territory of a county has been distributed among *de facto* corporations, whether in regular or irregular forms, the law upholds the corporations to the extent to which they extend and exercise their powers. They are *de facto* corporations so far and have the power to act within themselves and no further. *Clement* v. *Everest*, 29 Mich. 20.

Had the legislature restricted the city of Kaysville to the platted portion, as they had done by their own acts, the city would be liable for all debts, and not the corporation created out of it. *Laramie* v. *Albery*, 92 U. S. 307.

To summarize the objection to the jurisdiction of Kaysville City, we may say, first, that all outside of the limits named have ceased to belong to that city by reason of its acquiesence in the existence of other corporations. Second, that plaintiff is estopped by its conduct of non-use for nearly ten years from exercising authority over the rest of the original territory. Third, the judgment of the court is *res adjudicata*.

Where the subject matter of a litigation has once been finally passed upon by a court of competent jurisdiction, it has become *res adjudicata* and binding upon the parties to the action and the same matter cannot be subse-

quently opened to be considered by the same parties. Van Fleet on Former Adjudication, 2d Vol., Sec. 569; *Cannon* v. *Nelson*, 48 N. W., 1033; *Dicken* v. *Morgan*, 59, Iowa, 160; *Harmon* v. *The Auditor*, 123 Ills., 122.

It appears by the stipulation of facts of record in this case, that the Board of County Commissioners of Davis County adopted a resolution in March, 1889, by the terms of which a portion of Kaysville City was set off into a precinct to be known as Layton Precinct. That the boundaries of the precinct had not been changed and within it is situated the settlement of Layton. We infer that the county commissioners created this precinct in pursuance of the decision in the Linford case, and we contend that by this action a corporation, at least *de facto*, has existed for these eight years, and that the validity of its corporate existence cannot be questioned. *Clement* v. *Everest*, 29 Mich., 20.

The members of this precinct cannot now be taxed, governed or controlled in any way by Kaysville City. Before the city would be allowed to exercise any jurisdiction over the precinct it must proceed directly to oust the precinct of its legal existence. *State* v. *Town of Winter Park*, 5 So. Rep. 818.

Zane, C. J.

The defendant was charged with violating an ordinance of Kaysville City, in doing business as a merchant, without obtaining a license, tried before a justice of the peace and fined in the sum of $50.00, from which he appealed to the district court, which found him not guilty, and entered a judgment dismissing the suit. From this judgment the plaintiff has appealed to this court, and assigns it as error.

The limits of Kaysville City, fixed by an act of the

Legislature of the late Territory of Utah, embraces 14,220 acres of land. The city, so far as indicated by dwellings, or other buildings, or by streets, alleys or lots, occupies but comparatively a small portion of the area, and has a population of 700. The defendant's store, where he was doing the business for which he was required to take out the license is situated two miles away. Around this store the railway station and U. S. postoffice near by are a number of dwellings in which 400 people reside; the place is called Layton. On March 12th, 1889, the Board of County Commissioners of Davis County, in which it is located, adopted a resolution creating Layton Precinct, which elected a justice of the peace and a constable.

No part of Layton is platted into blocks or lots, nor does Kaysville furnish it police protection or expend any portion of its revenues for its benefit. The lands between Kaysville and Layton for the distance of about two miles are used for grazing or agricultural purposes. The money collected for licenses to merchants, which is in effect a tax upon their business, constitutes a portion of the revenues of Kaysville. The revenue for such taxes, whether upon the business or property of the people of Layton is appropriated to the use and benefit of the people of Kaysville, and lessens the amount of their taxes. No part of such revenue is appropriated, as it appears from the evidence, for the benefit of the residents of Layton. This brings us to the question, Was Kaysville City authorized to require the defendant to pay the tax in dispute?

In the case of *People* v. *Daniels*, 6 Utah 288, the Supreme Court of the late Territory held the assessment. and collection of a tax upon a farm situated two miles from Moroni City as indicated by buildings, streets, or other improvements though within its limits as defined by

its charter, when no part of its revenues went to benefit the farm or its occupants, was a violation of the last pro. hibition of Article 5 of the Constitution of the United States, as follows, "Nor shall private property be taken for public use without just compensation."

That was a limitation upon the powers of the federal government and of course upon the territorial government created by it, but not upon the States, and therefore not upon Utah since Statehood, but Sec. 22 of Article 1 of the constitution of this State declares that "Private property shall not be taken or damaged for public use without just compensation." This is a limitation upon the State legislature, and if it embraces all kinds of private property as its language imports, without regard to its nature or form, it includes money, that being a species of property. The right of property in money is as valuable and important as that of real estate, and also requires protection. The real estate of the individual may be taken from him and transferred to the public for its use by condemnation under the right of eminent domain, upon making just compensation, or it may be assessed under the taxing power, seized, sold and transferred to another, and the money received may be taken by the public and used in paying its officers, in making public improvements, or used for other public purposes. The method differs, but the effect upon the individual's right to his property is the same. By the former process the public gets the use of the individual's real estate; by the latter it gets the use of the money into which the individual's real estate is converted. The owner cannot be deprived of his property by either method without just compensation. By one method he is compensated in money, by the other he receives his compensation in the protection the State or city affords him,—in such benefits.

When the land is taken by the public in pursuance of the right of eminent domain compensation can be determined by the standard of market value; while there is no standard by which the pecuniary value of a just government to the individual can be accurately estimated, but we know its benefits exceed in value the taxes he pays.    That value compensates the individual for them.    The merchant's business, as in this case, is not appropriated to the use of the public; but the money he pays for the license is.

Undoubtedly Kaysville City has the power to require any merchant doing business within the range of its protection and benefits, to pay for a license; but it has no authority to require those doing business outside of such limits to do so, when the sole purpose and effect of a tax upon their property or business is the lessening of the taxes of its people.

A municipality has no power to collect a tax upon property or business situated so that it cannot receive any protection or benefit from it.    In such case there is no compensation for the property taken, though it may be a species of property termed money.    And the legislature cannot extend or maintain the limits of a city for such purpose and which has such an effect.

From the evidence the probability is the defendant's business would be more valuable, and the people of Layton would be better off if there was no such city as Kaysville. It may be said that the State has the power to collect a tax upon all the property within its limits, but in such case the state is supposed to give protection to all its people and to benefit all the property within its borders; the same may be said of the county; but in this case the defendant, and others situated as he is, are included in its limits for the sole purpose of benefiting others—their money is given

to others without their consent, without any compensation in municipal benefits or otherwise.

In the case of the *People* v. *Daniels, supra,* after quoting the provisions of the federal constitution, and stating that it applied to that government, and to the territories but not to the states, it was said: "The government may appropriate the property of the individual when necessary in one of three ways: First, by taking in the mode prescribed after paying the owner for it; second, by estimating the benefits to the owner's property from the improvements to be made, and taking the amount estimated in money; third, by taking the property in the form of money by the methods of taxation for which the benefits of protection and other advantages are furnished by the government. The same principal underlies all these methods. When the property is taken under the right of eminent domain, the public pays the owner in money; when money is exacted by means of a special assessment the owners are compensated in special benefits to their property by public improvements made in its expenditure; and when money is exacted by a general tax, the payer is compensated in the benefits received from the government in any and all of the ways that a government may benefit society."

Later in the same opinion is found the following:

" But they also say that the constitutional provision in question has reference to the taking of private property for public use under the right of eminent domain. They concede, however, that taxation and eminent domain rest on the same foundation—the principle of compensation—and that such compensation in case of taxation is in benefits. The constitutional provision in question was designed doubtless to give effect to that principle; but if the provision simply forbids the taking of private property for public use without just compensation under the right of

eminent domain, then its authors made the constitutional rule narrower than the principle upon which they intended to base it, because the principle requires compensation in all cases, whether real estate, money, or any other kind of property is involved; whether it is taken by the methods adopted under the right of eminent domain, or under the right of taxation, or by any other means. The principle lies deeper than mere forms or methods. It would be unreasonable to say that the authors of the provision in question intended to forbid the taking under one right without just compensation, and intended to allow such appropriation under another right; that they intentionally closed one gap, but intentionally left another down by which the same wrong in effect could be accomplished."

The above case was relied upon and followed in *Ellison* v. *Linford*, 7 Utah, 166. The defendant in the case in hand was plaintiff in that case, and the collector of this plaintiff was the defendant. The following authorities support the conclusions we have reached: *Bradshaw* v. *City of Omaha*, 1 Neb. 16; *Morford* v. *Unger*, 8 Iowa, 82; *Cheney* v. *Hooser*, 48 Ky. 330; *City of Covington* v. *Southgate*, 54 Ky. 491; *Arbegust* v. *City of Louisville*, 65 Ky. 271; *Sharp's Executor* v. *Dunavan*, 56 Ky. 223; *Langworthy* v. *City of Dubuque*, 13 Iowa, 86; *Fulton* v. *The City of Davenport*, 17 Iowa, 408; *Wells* v. *The City of Weston*, 22 Mo. 384; *Buell* v. *Ball*, 20 Iowa, 282; *Deeds* v. *Sanborn*, 26 Iowa, 419; *Deiman* v. *City of Fort Madison*, 30 Iowa, 542.

There is a conflict in the authorities which cannot be reconciled; but we are of the opinion those supporting the view we have taken rest upon better reasons.

The judgment is affirmed, with costs to respondent.

BARTCH, J. and MINER, J., concur.