## H. PARLEY KIMBALL, RESPONDENT, v. GRANTS-VILLE CITY, A MUNICIPAL CORPORATION, S. W. HOUSE, TREASURER AND COLLECTOR, APPELLANTS.[1]

ART. 5, AMEDMENTS TO U. S. CONST.— NOT RESTRICTIVE UPON STATE GOVERNMENT — TAXING POWER OF STATE — EMINENT DOMAIN — SEC. 22, ART. 1, CONST. LAW-MAKING POWER — WHERE VESTED — ACT PASSED IN ABSENCE OF CONSTITUTIONAL LIMITATION — POWER OF COURT OVER — ABUSE OF TAXING POWER — WHEN NO POWER IN COURTS TO CORRECT. SEC. 5, ART. 13 CONST.—SEC. 10, ART. 13 CONST.— TAX FOR MUNICIPAL PURPOSES — PROPERTY SUBJECT TO — TERRITORIAL LIMITS OF MUNICIPALITY — LEGISLATIVE DISCRETION — JUDICIAL REVISION. RULE OF STARE DECISIS — NOT ALWAYS INFLEXIBLE — WHEN DOCTRINE DOES NOT APPLY.

1. *Art. 5 Amendments to U. S. Constitution — Not Restrictive upon State Government.*

Article 5 of Amendments to the Constitution of the U. S., is a restriction upon the legislative functions of the Federal Government, not of a State Government.

---

[1]*Kaysville City* v. *Ellison*, 18 Utah, 163, overruled.

2. *Taxing Power of State — Eminent Domain — Sec. 22, Art. 1, Const.*
   Sec 22, Art. 1 of the Constitution is not a limitation on the taxing power of the State, but is a limitation on the exercise of the power of eminent domain.

3. *Law-Making Power — Where Vested — Act Passed in Absence of Constitutional Limitation — Power of Court Over.*
   The whole law-making power of a State, except such as is reserved by the State or Federal Constitution, having been committed to the Legislature, in the absence of any constitutional restraint, express or implied, the Legislature may act upon any subject within the sphere of the government; and if, in the absence of any constitutional restriction, it makes a law, there is no authority in the government which can declare it void, and no court has power to arrest its execution.

4. *Abuse of Taxing Power — When No Power in Courts to Correct.*
   Although in the passage of laws there may have been an abuse of the taxing power, unless some constitutional provision is violated, courts have no authority to prevent their execution.

5. *Sec. 5, Art. 13 Const.— Sec. 10, Art. 13 Const.— Tax for Municipal Purposes — Property Subject to — Territorial Limits of Municipality — Legislative Discretion — Judicial Revision.*
   Under Sec. 5, Art. 13, Const., the Legislature is prohibited from imposing a tax upon property within any city for municipal purposes, but is given the right to delegate that power to the municipality; under Sec. 10, Art. 13, Const., property subject to taxation is limited to real or personal property within the limits of the authority levying the tax; and the extent of the territorial limits of a municipality being a matter of legislative discretion, the exercise of such discretion is not a subject of judicial revision.

6. *Rule of Stare Decisis — Not always Inflexible — When Doctrine Does Not Apply.*
   The rule of *stare decisis* is not always inflexible, and when there has been but a single decision which is clearly erroneous, or where the questionable matter was not necessarily involved in the case, or where the points involved were decided contrary to well-established legal principles, or where it appears that facts and conditions were materially different, or, where it is

19 Utah—24

manifest that the law has been erroneously decided, the doctrine ought not to be applied.

(Decided April 29, 1899.)

Appeal from the Third District Court, Hon. A. N. Cherry, *Judge.*

Action to restrain the collection of a city tax levied upon property of the plaintiff for the year 1897 by the authorities of Grantsville City, a city of the third class, incorporated under the act of the territorial Legislature. The lands on which the tax in controversy was levied are situated about one and one-half miles from platted and built-up portions of the city and are used for agricultural purposes.

At the trial a portion of these lands was held to be within the range of municipal benefits, subject to the city tax, and the remaining portion was held to be without the range of such benefits and not subject to taxation, although within the territorial limits of the city.

From the decree entered, defendant appeals.   *Reversed.*

*Messrs. Rawlins, Thurman, Hurd & Wedgwood,* for appellants.

Under the express terms of the statutory provisions, all property within the corporate limits is subject to the payment of city taxes.

The boundaries of Grantsville City are defined in Sub. 1, Sec. 1511 of the Laws of 1888, and this law, under Sec. 2, Art. 24 of the State constitution, and Sec. 311 of the Revised Statutes of 1898, is continued in force, and the boundaries thereof, as theretofore established, adopted, and confirmed.   Under Sec. 1527, Vol. 1 of Laws of 1888, which was in force at the time of the levy com-

plained of, all property within the corporate limits of Grantsville City is made liable to pay city taxes.

The statutory provisions requiring the payment of city taxes upon all the property within the corporate limits, do not violate any provisions of the State or Federal Constitutions, but are a valid and lawful exercise of the legislative functions, and should be given full force and effect.

Whatever may be said as to the latter propositions, it certainly can not be said that the collection of taxes would deprive respondents of their property without due process of law.    This question would seem to be definitely settled by both this court and the Supreme Court of the United States.    *People* v. *Daniels*, 6 Utah, 288; *Kelly* v. *Pittsburgh*, 104 U. S., 78, affirming 85 Pa. St., 170; *Davidson* v. *New Orleans*, 96 U. S., 97; *Walston* v. *Nevin*, 128 U. S., 578; Cooley's Const. Lim., 437 *et seq.* (5th ed.).

The constitutional provision that private property shall not be taken or damaged for public use without just compensation, relates simply to the power of eminent domain, and is not a restriction on the power of taxation.    2 Dill. Mun. Corp., Sec. 738; Desty on Taxation, 30, 31; Hare Am. Const. Law, 332; Potter's Dwarris on Statutes, 404, *et seq.;* Cooley's Const. Lim. (5th ed.), 620; *Gilman* v. *City of Sheboygan*, 2 Black, U. S., 510; *County of Mobile* v. *Kimball*, 102 U. S., 691, 702, *et seq.;* Cooley on Const. Lim., p. 620.

*James A. Williams, Esq.*, for respondent.

The broad question involved is the right of a city to tax agricultural lands within the city limits.    The record is such that the distinguished counsel for the city have been forced to contend that the city has a right to tax all lands within its limits regardless of the situation, and whether

receiving any municipal benefits or not. In other words, the city is compelled to ask this court to overrule all the following cases : *Salt Lake City* v. *Wagener*, 2 Utah, 400; *People* v. *Daniels*, 6 Utah, 288; *Ellison* v. *Linford*, 7 Utah, 166; *Cook* v. *Crandall*, 7 Utah, 344; *Kaysville City* v. *Ellison* (decided September term, 1898).

This case comes clearly within the rule of *stare decisis*, and the court is bound, not by one decision, but by a series of decisions. " It is better that the law be settled than that it always be right." Wells on *Res Adjudicata* and *Stare Decisis*, 578; *Salt Lake City* v. *Wagener*, 2 Utah, 400; *People* v. *Daniels*, 6 Utah, 297; *Cook* v. *Crandall*, 7 Utah, 344; *Kaysville City* v. *Ellison*, 18 Utah, 163.

BARTCH, C. J.

This action was brought to restrain the collection of a city tax levied upon the property of the respondent for the year 1897, by the local authorities of Grantsville City. It appears that Grantsville City is a municipal corporation of the third class, incorporated by act of the territorial Legislature, Sec. 1511, C. L. U., 1888, and its name and boundaries were " perpetuated " under Section 311, R. S., 1898. The city's charter provides for a city government with power, among other things, to levy and collect taxes for city purposes on all taxable property within its corporate limits. C. L. U., 1888, Sec. 1512, *et seq.*

The area of the city is about four and a half miles square, and has a population, as appears from the findings of fact, of about one thousand. The lands on which the tax in controversy was levied, are situate about one and a half miles from the platted and built-up portion of the city and are used for agricultural purposes. At the trial

a portion of these lands were held to be within the range of municipal benefits, subject to city taxation, while the remaining portion was held to be without the range of such benefits, and therefore not subject to such taxation, although all these lands lie within the territorial limits of the city.

The question of paramount importance presented on this appeal is whether the several statutory provisions relating to Grantsville City, and requiring the payment of city taxes upon all property within the corporate limits of the city, are violative of any provision of the State or Federal Constitutions, since such provisions of statute authorize the taxation for city purposes of lands lying outside the platted and improved portion of the city, and used only for the business of agriculture. In other words, is such taxation a lawful exercise of the legislative functions of the State?

To burden such lands or property with city taxes is not inhibited by the provision of Article 5 of Amendments to the Constitution of the United States that private property shall not be taken "for public use without just compensation," because that article is a restriction upon the legislative functions of the Federal government and has no application to such functions of a State government. *Kelley* v *Pittsburgh*, 104 U. S., 78.

The appellants insist and the respondent concedes that the exercise of such legislative power by the State is not in violation of Sec. 1, Art. 14, Const. United States, wherein it is provided that no State shall deprive any person of his property "without due process of law." We need, therefore, give these provisions of the Constitution of the United States no further consideration in the disposition of this case. It is insisted, however, that a portion of the lands are situate beyond the range of munici-

pal benefits, and that, as to such lands, a tax for city improvements and expenses is inhibited by Sec. 22, Art. 1 of the constitution of this State, which provides: "Private property shall not be taken or damaged for public use without just compensation." The question is, Does this provision of the constitution relate only to the right of eminent domain, or does it also limit the power of taxation? Private property may be taken constitutionally for public use both by the right of eminent domain and by taxation. The right of eminent domain and the right of taxation are both founded in necessity. They are rights reserved by the people in their collective capacity over the property of individuals, and therefore are powers inherent in the sovereignty itself. The power of the State over the property of its subjects extends not only to taxation and eminent domain, but also to public morals, public health, police, and probably other public interests, and may be exercised by resuming a portion of such property whenever public exigencies demand it. All such governmental rights have their foundation in the social system, and are necessary for the public weal. Hence the government has power to compel the relinquishment of individual interests when it becomes necessary for the benefit of all. While it is true that eminent domain and taxation rest substantially on the same foundation, and that by either right private property may be taken for public use, there are, nevertheless, important distinctions between the two rights. The power of eminent domain operates on real property principally, and seldom if ever, even in time of war, are the exigencies of government such as to require the taking of money by virtue of this power, and never in time of peace. This, however, seems to result from the title to the landed property being in the body politic, as distinguished from the derivative

title of the subject to his property. The doctrine that the nation or the people in their organized capacity own the soil had its origin in antiquity. This prevailed under the feudal system which seems to have originated from the military policy of the Celtic nations, who, at the declension of the Roman Empire, migrated into all the European regions, and, to secure their new acquisitions, obtained by right of conquest, continued in their respective colonies. The lands were allotted by the conquering general to the superior military officers, and by them again parceled out to the inferior officers and most deserving soldiers as a reward for services, conditioned, however, that the possessor would faithfully perform certain stipulated service to his lord. "Allotments thus acquired mutually engaged such as accepted them to defend them; and, as they all sprang from the same right of conquest, no part could subsist independent of the whole; wherefore, all givers as well as receivers were mutually bound to defend each other's possessions. But, as that could not effectually be done in a tumultuous, irregular way, government, and to that purpose, subordination, was neccesary." 2 Bl. Com., 45.

The fundamental maxim of feudal tenure was, that the titles to landed property were originally granted by the sovereign, and were therefore held, either directly or indirectly of the crown. The dominion or ultimate property of the feud remained in the king or grantor, and the title of the grantee or vassal was subject to such dominion. In the process of time the feudal system came to be regarded more in the light of a civil establishment than in that of a military plan, and the title of the grantee became more certain, but still the rights of the crown in the landed property, for the purposes of government, remained supreme.

So, in the United States, the land almost if not quite exclusively, was originally granted by the king, the proprietaries whom he enfeoffed, the States which succeeded to the proprietary rights, or the federal government. It is because of such ownership that one government may, under circumstances requiring it, exclude the subjects of another, to prevent injustice to his own subjects and protect the nation from " peaceful invasion, which, under the guise of emigration, would subvert its religion, institutions, and laws." 1 Hare's Am. Const. Law, 334.

From the same source comes the right of eminent domain, and it enables the State to resume such portions of the landed property as may be needed for public use in improvements and salutary measures, which concern the people as a whole. This power operates upon property to appropriate it specifically to some end which can not be obtained in any other way, and divests the individual wholly of his title, and revests it in the sovereignty, thus preventing the individual owner from thereafter making any use of it whatever. The property so taken may be, and generally is, by the State turned into an entirely different use from that in which it was employed by the former owner, or it may be damaged or destroyed altogether, as the exigencies of the public may require. And, when property is taken or destroyed by virtue of this right, there is no thought of just contribution by the owner, of his share of the public burden, for such is not the case, since the value of the property taken is so much beyond his share. Nor is it material whether any other owner is likewise or at all deprived of his property. Under the power of eminent domain, the owner may be compelled to surrender his residence, or farm, or the very property which long enjoyment and use have most endeared, without any other compensation

than the fair market value thereof, and such compensation and only such he is entitled to, by virtue of the provision of the constitution here under consideration. That provision relates to the right of eminent domain, and prevents the damaging or taking of any private property by the sovereignty without just compensation. Therefore when the State exercises the right, it becomes a debtor for the property so taken or damaged. The taking of private property under the right of eminent domain may also be likened to a sale by the owner, differing therefrom only in that the transfer of the title may be compelled by the government, and the price determined by proper officers or a jury. Such are some of the incidents connected with the exercise of the right of eminent domain. Hare's Am. Const. Law, 331–333. *County of Kimball* v. *Kimball*, 102 U. S., 691.

Now of the right of taxation. It operates upon all persons and upon all private property for the benefit of all. It exacts money or services according to some rule of apportionment, as contributions from individuals, for improvements, and for the support of the government, without any thought of compensation, except that the objects of public utility promoted thereby are supposed to return to the individual, benefits, equal in value to the amount of his tax, or contribution to the public burden. Taxation, however, does not divest the owner of his title to property, except in cases of failure to pay the tax. Nor does it prevent the owner from enjoying it or making any use of it. Nor does it injure or destroy it. This power simply imposes a burden which is supposed to fall equally upon all, for the maintenance of the government and improvements that are supposed to enhance the interests of all. The obligation of such burden is discharged by the payment of money, or in some instances,

by service, as, for instance the building of roads, bridges, and the like. Taxation, therefore, will always provide the government with money, but not with any other property, and without the power to compel contributions for public use in money no government could exist. Potter's Dwarris on Statutes and Constitutions, 403–405.

From the foregoing observations, it seems clear that there are material distinctions between the right of eminent domain and the right of taxation, although both originated in political necessity and rest substantially on the same foundation. The former, as we have seen, divests title of owner and prevents further use or enjoyment of the property by him ; the latter does not affect title of, nor use, nor enjoyment by the owner. The former makes direct, actual compensation for the property taken or damaged ; the latter, theoretical or indirect compensation for the tax — such as is supposed will be received by the tax-payer on account of benefits. So, the former operates upon the property of an individual without reference to that of others, not to enforce a ratable and equitable portion of a contribution to the public burden, but to obtain for public use so much beyond ; the latter operates upon all private property, whether it belongs to individuals or corporations, to compel a proportionate contribution for the use of the government.

The surrender of landed property may be compelled by the right of eminent domain, but not by taxation; and money may always be obtained by taxation, but not by eminent domain. Thus from these considerations and in view of the incidents peculiar to each of these powers of the government, it is difficult to perceive how the provision of the constitution that private property shall not be taken or damaged for public use without just compen-

sation, can be interpreted to be a limitation upon the taxing power of the State. It is true that money is private property and that taxation takes money for public use, and thus may be said to take private property for such use without direct, actual compensation, or any compensation, except such as results from the public benefit in which all are supposed to have an interest. If, therefore, this should be so rigidly interpreted as to make it fall within that constitutional inhibition, it would be a menace to the very existence of the government, because of its susceptibility to use as an instrument to arrest all governmental operations, for upon every occasion of the levying of tax upon the private property in the State or in a district, the owners thereof, or any of them who felt themselves aggrieved, might, on the ground, real or supposed, that the tax was in excess of the benefits, and therefore, its exaction a taking of private property without just compensation, prevent, by proceedings in court, the collection of the tax until a decision could be obtained. Interminable litigation, endless delay in the collection of taxes, and interference with improvements and administration of the government, would be the natural sequence. No such results were intended by the framers of the constitution, nor should they be aided by judicial construction. We are, therefore, of the opinion that the constitutional provision prohibiting the damaging or taking of private property for public use without just compensation, is not a limitation on the taxing power of the State, but is a limitation on the exercise of the power of eminent domain, and this we conceive to be in accord with the weight of authority.

In Desty on Taxation, 30, the author says: "Private property may be taken for public use either by the power of taxation or the power of eminent domain; but while

the right to take private property for public use, under the power of eminent domain, is conditioned upon just compensation, the taxing power is not thus limited."

So, in Potter's Dwarris on Statutes and Constitutions, 404, it is said: "The restriction on taking private property without compensation does not apply to the power of taxation."

In Cooley's Constitutional Limitations, 613, it is observed : "When the constitution provides that private property shall not be taken for public use without just compensation made therefor, it has reference to an appropriation thereof under the right of eminent domain."

In *County of Mobile* v. *Kimball*, 102 U. S., 691, Mr. Justice Field, delivering the opinion of the court, said: "The expenses of the work were of course to be ultimately defrayed by taxation upon the property and people of the county. But neither is taxation for a public purpose, however great, the taking of private property for public uses, in the sense of the Constitution. Taxation only exacts a contribution from individuals of the State or of a particular district, for the support of the government, or to meet some public expenditure authorized by it, for which they receive compensation in the protection which government affords, or in the benefits of the special expenditure. But when private property is taken for public use, the owner receives full compensation."

So, in *Gilman* v. *Sheboygan*, 2 Black (U. S), 510, Mr. Justice Swayne, delivering the opinion, said: "The objection that these acts take private property for public purposes without compensation, and hence are within the prohibition of the State constitution, upon that subject, is also without foundation. That clause of the constitution refers solely to the exercise by the State, of the right of eminent domain."

In the leading case of the *People* v. *Mayor, etc.*, of Brooklyn, 4 Const., 419, Mr. Justice Ruggles expressed the opinion that money could not be exacted by the government by right of eminent domain, excepting, perhaps, for the direct use of the State at large, and where the State at large was to make the compensation, and then observed: "The exigencies of a State government can seldom require the taking of money by virtue of this power even in time of war, and never in time of peace. The framers of the constitution could not have intended to delegate to municipal corporations the right of taking money under this power, because it is entirely unnecessary. Money can always be had by taxation; lands can not; and therefore lands may be taken by right of eminent domain, but money may not."

And in *Stewart* v. *the Board of Supervisors of Polk Co.*, 30 Ia., 9, Mr. Justice Miller, speaking for the court, said: "While the right to take private property for public use is conditioned upon making compensation, the taxing power is not thus limited. Indeed, the very idea of taxation implies the power to collect levies of money from the people without making any direct pecuniary compensation. The only revenue possessed by the State is derived from taxation, and it would be absurd to say that she should compensate the citizens for taxes collected.

"It is well settled that this clause of the constitution requiring compensation to be made where private property is taken for public use is not a limitation upon the taxing power." Dillon Mun. Corporations, Sec. 738; Cooley on Taxation, 237; *People ex rel. Crowell* v. *Lawrence*, 41 N. Y., 137; *Sharpless* v. *Mayor of Philadelphia*, 9 Harris, 147; *Nichols* v. *Bridgeport*, 23 Conn., 187; *Town of Guilford* v. *Cornell*, 18 · Barb, 615;

*M'Masters* v. *Commonwealth*, 3 Watts, 292; *Williams* v. *Mayor*, 2 Mich., 560; *Moale* v. *Mayor*, 5 Md., 314; *Schenley* v. *City of Allegheny*, 25 Pa. St., 128; *Commonwealth* v. *Alger*, 7 Cush, 53; *Justices of Clarke Co.* v. *P. W. & R. R. Turnpike Co.*, 11 B. Mon., 148; Extension of Hancock Street, 18 Pa. St., 26; *Booth* v. *Town of Woodbury*, 32 Conn., 118; *Norris* v. *Waco*, 57 Tex., 635; *The City of Aurora* v. *West*, 9 Ind., 74.

Having determined that the constitutional inhibition against the taking or damaging of private property for public use without just compensation, has no application to the taxing power of the State, we come now to the inquiry whether, notwithstanding such determination, the tax in controversy is a lawful exercise of the power of taxation. In other words, whether the statutes hereinbefore referred to, which fix the boundaries of Grantsville City so as to include large portions of agricultural land, and provide for the taxation, for municipal purposes, of all property within the territorial limits, are such enactments as are within the legislative functions of the State government. The powers of the State government were, by the organic law, divided into three distinct departments,— the legislative, executive, and judicial; and no person or persons, whose duty it is to exercise the functions of one department, can exercise any power belonging properly to either of the others, except in cases expressly authorized by the constitution. The legislative power was vested exclusively in the Legislature, and it is within its sphere to make the laws for the government of the State. The power to execute the laws was referred to the executive department, and the power to declare what are the laws, to the judiciary. The departments are all upon the same plane, all are co-ordinate branches of the same government, each absolute within its sphere, except as limited

or controlled by the constitution of this State or of the
United States. The apportionment of distinct power to
one department of itself implies an inhibition against its
exercise by either of the other departments. The state
having thus committed its whole law-making power to the
Legislature, excepting such as is expressly or impliedly
withheld by the State or federal constitution, it has plenary
power for all purpose of civil government. Therefore,
in the absence of any constitutional restraint, express or
implied, the Legislature may act upon any subject within
the sphere of the government. It may enact laws affect-
ing the State at large and all its people, and for the pur-
pose of creating local jurisdictions it may establish
districts, provide for the incorporation of towns and
cities, and enact laws for the government of such districts
and municipalities. So, the Legislature may, when inde-
pendent of any prohibition, expressly made or necessarily
implied, make special laws relating to any municipality,
section, or district within the State, and whenever an
inquiry is directed questioning the constitutionality of a
legislative enactment, it is for him who asserts its invalid-
ity to show that it is forbidden. It is wholly within the
discretion of the Legislature to determine whether, con-
cerning any subject, such conditions, or such facts
and circumstances exist as to warrant it to act. It is
the sole judge as to whether an exigency, or such cause
exists as requires the enactment of a law, and, in
the absence of any constitutional restriction, if it makes
a law, there is no authority in the government which
can declare it void. Independently of any repugnance
between a legislative act and any constitutional lim-
itation or restriction, a court has no power to arrest its
execution, however unwise or unjust, in the opinion of the
court, it may be, or whatever motives may have led to its

enactment.  So, likewise, it is within the power of the Legislature to establish administrative boards in local jurisdictions and · distribute to them such administrative functions as, in its judgment, it may deem necessary and convenient for the public welfare, and may retain others of such functions to be exercised by the central power, and such arrangements it may change from time to time, as in its discretion the public welfare may require.  In *Bank of Chenango* v. *Brown*, 26 N. Y., 467, Mr. Justice Emmott, speaking for the court, said:  "The Legislature of this State possess the whole legislative power of the people, except so far as they are limited by the constitution.  In a judicial sense, and so far as courts are concerned with its application and construction, their authority is absolute and unlimited, except by the express restrictions of the fundamental law.  The power to pass a general act for the incorporation of villages does not result from the directions contained in the constitution, that the Legislature shall provide for the ' organization of cities and incorporated villages; ' or· that ' corporations may be formed under general laws' but from the general authority of the legislative body."  *People* v. *Draper*, 15 N. Y., 532; *Turner* v. *Althans*, 6 Neb., 54.

There is without doubt plenty of room within the pale of the constitution for ill-advised legislation and bad government, and it is not strange that such is the fact because all human institutions are imperfect.  None are perfect.  The provisions of the constitution for frequent renewals of the Legislature, however, tend to restrain bad legislation by placing the positions of legislators in the hands of their constituents, and afford a better remedy than any which the judiciary can provide.  This is true as to legislation for revenue as well as for any other purpose.  The taxing power of the State is lodged absolutely in the Legis-

lature, and as the responsibility of enacting laws devolves exclusively upon that branch of the government, whether the right of taxation has been exercised justly or unjustly, wisely or unwisely, it is not for the judiciary to inquire. That is a matter between the people and their representatives. So, even though in some instances, there be an abuse of the taxing power, unless such laws are in conflict with some constitutional provision, either expressly or by implication, the courts have no authority to prevent their execution. On this subject Mr. Chief Justice Marshall in *M'Culloch* v. *State of Maryland*, 4 Wheat, 316, 428, says: "The power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power, is found in the structure of the government itself. In imposing a tax, the Legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.

"The people of a State, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government can not be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard them against its abuse."

And again, he speaks of it as unfit the judicial department to inquire "what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power." In *Providence Bank* v. *Billings*, 4 Pet., 514, 562, the same eminent jurist observes: "The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body poli-

tic. This is an original principle which has its foundation in society itself. It is granted by all for the benefit of all. It resides in the government as part of itself, and need not be reserved where property of any description or the right to use it in any manner is granted to individuals or corporate bodies. However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burthens; and that portion must be determined by the Legislature. This vital power may be abused, but the interest, wisdom, and justice of the representative body, and its relations with its constituents, furnish the only security against unjust and excessive taxation, as well as against unwise legislation.''

Accepting this as sound doctrine, as we safely may, would not the judicial department itself be guilty of transcending its constitutional power were it to inquire into the expediency, wisdom, or justice of the legislation in questions in this case? Would not this department likewise transcend its power if it would undertake to inquire into the conditions and facts on which the Legislature acted in creating the municipality of Grantsville City, fixing the boundaries and providing for the raising of revenue to maintain the municipal government and defray its expenses, and then substitute our judgment as to the sufficiency of such conditions and facts to warrant the legislation, which has resulted in the imposition of the tax complained of, for that of the Legislature? Yet this is substantially what we are asked to do. This in itself would be an abuse because it would be a usurpation of power by one department of the government which the people absolutely vested in another. We are aware of no limitation or restriction, and none has been pointed out by counsel, which authorizes us to set aside the legislation in

question.   But notwithstanding the validity of the stat-
utes under which the tax in dispute was levied, it appears
to be maintained that the municipality had no right to tax
a certain portion of respondent's land, because it is used
only for agricultural purposes, is situate without the im-
proved and platted portion of the city, and beyond the
range of municipal benefits, although within the territorial
limits of the municipality.   The position here assumed
and contended for appears to be that the theory of repay-
ment to the owner of the property taxed, in benefits and
improvements in which he is supposed to have an interest,
applies only as to property situated within the corporate
limits, which is actually not in theory benefited because
of the local government.   But who, it may be asked, is
to determine the range of municipal benefits ?   Who is to
establish the line beyond which no benefits accrue to the
owner of property because of the public improvements
and maintenance of the municipal government ?   To de-
termine where the exact location of such a line is — where
municipal benefits cease, is a question of fact, upon which,
without doubt, persons would differ widely.   Some would
probably assert that municipal benefits are confined to a
circle embracing the improved portions of the city where
the police patrol and the firemen ply their avocations;
others might insist that it included the platted portion of
the city; and yet others might maintain, with much plau-
sibility, that agricultural lands for a considerable distance
from the improved portion of the city receive benefits in
enhanced value and convenience to the owner because of
the local government.   Again, the facts might be suffi-
cient to convince some minds, notwithstanding that the
owners of property in the business portion of a city are
benefited most by the municipal government, that those
remote from such business portions receive some benefit,

less, it is probably true, as the distance from the center of
the city increases, and justify such taxation on the ground
that, while the benefits to property remotely situated were
less, the valuation on which the assessment would be made
would also be less in proportion as the distance from the
center of the city increased.   Since, therefore, the ques-
tion of the range of municipal benefits is one based on
facts, and as there is room for a wide difference of opinion
respecting it, would not, even if the judicial department
could and were disposed to assume control of the matter
of establishing the boundaries of municipalities, a judicial
inquiry into the facts, after the usual method in courts,
and a decision based upon the statements of witnesses, be
likely to prove quite as unsatisfactory as the conclusion of
legislators reached from personal knowledge and investiga-
tion which they are supposed to possess and make ?   Would
not the action of the Legislature be more conclusive, more
certain and reliable, more consistent with reason and sound
policy than any decision of a court could be ?.  Take, for
instance, the case at bar, where the court below decided
that some of respondent's land was within and some with-
out the range of municipal benefits.   Suppose this court
were to affirm the judgment, who can say that next year
there would not be another suit to enjoin the collection of
a similar tax on the same property on the ground of a
change in the range of municipal benefits, and so on from
year to year ?   The results would be fruitful sources of
litigation, constant delay in the collection of taxes, and
arrest of governmental operations.   To obtain these re-
sults and finally establish and settle this doctrine in this
State, it would be necessary for us either to declare the
statutes, which created the municipality and fixed its
boundaries, unconstitutional, although in conflict with no
constitutional limitation or restriction, and thus destroy

the tax district itself, or assume the rôle of legislators, and under the guise of judicial decisions upon questions of fact absolutely within the scope of the Legislature, change the laws so as to conform to our notions of the range of municipal benefits.    Were the doctrine here contended for finally to prevail, it would place the power of the judicial department above that of the legislative, in matters affecting not only the vital interests, but the very existence of the government.    If the doctrine obtains as to towns and cities, it obtains with equal force as to other districts, for who can say that property situate within a remote part of a county, without even a public road to it, is actually benefited by the county government.    It assumes that the judiciary, instead of the Legislature, is to be the final arbiter of taxation — that taxation is to be regulated by judicial instead of legislative discretion.    It makes actual, instead of probable or supposed benefits the test, and clothes the judiciary with power to try the validity of a tax by a test neither defined nor prescribed by the constitution.    It would obstruct the exercise of powers by the Legislature, which are inherent in that department, and restrain that branch of the government from action in cases in which the organic law has left it free to act, and yet afford no security against abuse of the taxing power. Again, the constitution has imposed upon the legislative department the duty of exercising the taxing power in wisdom and justice and so as to prevent abuses.    To assume, as this doctrine would indicate, that such duty has been neglected, is a denial of that reasonable confidence which one co-ordinate branch of the government should always entertain toward the others.    That occasionally abuses occur in taxation, and that occasionally agricultural lands are included within the corporate limits of towns and cities taxed unjustly for municipal purposes,

can scarcely be doubted, and it may be true that the tax in question herein is an unjust burden on the owner of the property, but however this may be, as we have seen, the taxing power of the State has been referred exclusively to the Legislature, and therefore, as the laws under which the tax was imposed are not in conflict with any constitutional prohibition expressly made or necessarily implied, we can grant no relief. In such case, the Legislature alone can afford a remedy. The judicial department can not arrogate to itself power not within its province. Nor can it legitimately question the policy or refuse to sanction the provisions of any law not inconsistent with the constitution. With respect to incorporated towns and cities "wherever corporate boundaries are established, it is to be understood that whatever property is included within those limits has been thus included by the Legislature, because it justly belongs there, as being within the circuit which is benefited by the local government, and which ought consequently to contribute to its burdens." Cooley on Const. Lim., 620.

"And an act for levying taxes and providing the means of enforcement is, as we have seen, within the unquestioned and unquestionable power of the Legislature." Cooley on Taxation, 48.

In *Kelly* v. *Pittsburg*, 104 U. S., 78, where the limits of a city were extended so as to include agricultural land, Mr. Justice Miller, delivering the opinion of the court, said: "It is not denied that the Legislature could rightfully enlarge the boundary of the city of Pittsburg so as to include the land. If this power were denied, we are unable to see how such denial could be sustained. What portion of a State shall be within the limits of a city and be governed by its authorities and its laws has always been considered to be a proper subject of legisla-

tion.   How thickly or how sparsely the territory within
a city must be settled is one of the matters within legisla-
tive discretion.   Whether territory shall be governed for
local purposes for a county, a city, or a township organi-
zation, is one of the most usual and ordinary subjects of
State legislation.''

And again he said: '' It may be true that he does not
receive the same amount of benefit from some or any of
these taxes as do citizens living in the heart of the city.
It probably is true, from the evidence found in this rec-
ord, that his tax bears a very unjust relation to the bene-
fits received as compared with its amount.   But who can
adjust with precise accuracy the amount which each indi-
vidual in an organized civil community shall contribute
to sustain it, or can insure in this respect absolute equal-
ity of burdens and fairness in their distribution among
those who must bear them?   We can not say judicially
that Kelly received no benefit from the city organiza-
tion.''

Mr. Justice Gibson, in *Kirby* v. *Shaw*, 19 Pa. St.,
258, discussing the question of taxation, observed: '' If
equality were practicable, in what branch of the govern-
ment would power to enforce it reside?   Not in the judi-
ciary, unless it were competent to set aside a law free
from collision with the constitution, because it seemed
unjust.   It would interpose only by overstepping the limits
of its sphere; by arrogating to itself a power beyond its
province; by producing intestine discord; and by setting
an example which other organs of the government might
not be slow to follow.   It is its peculiar duty to keep the
first lines of the constitution clear; and not to stretch its
power in order to correct legislative or executive abuses.
Every branch of the government, the judiciary included,
does injustice for which there is no remedy, because

everything human is imperfect. The sum of the matter is that the taxing power must be left to that part of the government which is to exercise it."

So in *Washburn* v. *Oshkosh*, 60 Wis., 453, Mr. Chief Justice Cole said : "It may be unwise, even unjust, to include within the limits of a city or village, lands used for agricultural purposes, and impose upon them the additional burdens of such municipalities. But where is the remedy ? Certainly not in the courts. Confessedly the Legislature has power, under the constitution, to provide for the organization of cities and incorporated villages, which carries with it the power to fix the territorial boundaries of such public corporations. If the Legislature sees fit to include agricultural lands within its boundaries, what right have the courts to control or review that legislative discretion? Can the courts say to the Legislature it must not annex this territory or that to the municipality ; that it has not ample power to prescribe the extent of the city or village limits? It seems to us a very plain proposition that such matters rest entirely within the discretion and under the control of the Legislature." Cooley on Taxation, 47, 149, 157; 2 Kent. Com., 306; 15 A. and E. Enc. Law, 1013; Cooley on Const. Lim., 623; Dillon on Mun. Corp., Secs. 185, 735, 737; *Linton* v. *Athens*, 53 Ga., 588; *Turner* v. *Althans*, 6 Neb., 54; *Kelly* v. *City of Pittsburg*, 85 Pa. St., 170; *People* v. *Lawrence*, 41 N. Y., 137; *Pence* v. *City of Frankfort*, 41 S. W. R., 1011; *The People* v. *Mayor, etc., of Brooklyn*, 4 Const., 419; Hewitt's Appeal, 88 Pa. St., 55; *Burnett* v. *City of Sacramento*, 12 Cal., 84; *Board* v. *Scott*, 42 S. W. R., 104; *Board* v. *Rarick*, 43 S. W. R., 450; *Cary* v. *City of Pekin*, 88 Ill., 154; *Madry* v. *Cox*, 73 Tex., 538; *Giboney* v. *City of Cape Girardeau*, 58 Mo., 141; *City of St. Louis* v. *Allen*, 13 Mo., 287;

*Hammett* v. *Philadelphia*, 65 Pa. St., 146; Washington Avenue, 69 Pa. St., 352; *Porter* v. *Railroad Co.*, 76 Ill., 561; *Walston* v. *Nevin*, 128 U. S., 578; *The City of Logansport* v. *Seybold*, 59 Ind., 225.

While we think there can be no doubt of the validity of the tax in this case upon principle, sound reason, and the authority of adjudged cases, and text writers, still the constitutionality of the statutes hereinbefore considered, and the power of the municipality to tax all the property within the corporate limits of the city will become yet more manifest by further reference to the constitution. Section 5, Article 13, provides : "The Legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation, but may, by law, vest in the corporate authorities thereof, respectively, the power to assess and collect taxes for all purposes of such corporation."

This section expressly prohibits the Legislature from imposing a tax for municipal purposes on the property situate within any city, and then authorizes that body to empower the municipality to assess and collect taxes for all purposes of the corporation. Clearly the legislation in question herein, which gives such authority to the local government, is in accord with this provision of the organic law. And Section 10 of the same article provides : "All corporations or persons in this State, or doing business herein, shall be subject to taxation for State, county, school, municipal, or other purposes, on the real and personal property owned or used by them within the territorial limits of the authority levying the tax."

Under this provision, all property, real and personal, situate "within the territorial limits of the authority levying the tax" is subject to taxation for "municipal or

other purposes." When, therefore, as in the case at bar, a city has been incorporated, and a local government established, such government is an "authority" to levy a tax. There is no limitation as to the extent of the "territorial limits" of a municipality or taxing district, and, therefore, as we have noticed, the fixing of the boundaries of a city or taxing district and amount of area it shall contain is wholly a matter of legislative discretion, and the exercise of such discretion is not a subject of judicial investigation or revision.

We are clearly of the opinion that Grantsville City has the right to tax all private property within its territorial limits.

Counsel in behalf of the respondent invokes the doctrine of *stare decisis*, and cites several cases decided by the supreme court of the late Territory of Utah, and one decided by this court since statehood. We do not agree that this is a case to which that doctrine should be applied. Nor do we dispute the efficacy of the general maxim *stare decisis, et non quieta movere*. When a point has once been decided by an appellate court, the decision forms a precedent which should not ordinarily be departed from, and never on any slight grounds; but courts occasionally find it necessary to overrule decisions which have been made contrary to principle and the law of the land, as established by statute, judicial decision, and the constitution. It must be admitted that it should require strong and controlling considerations to induce a court to depart from a former decision to lay again the foundation of a law; and when there has been a series of decisions, settling a question of law, and a change would seriously affect business interests established and acquired under the existing law, the rule of *stare decisis* becomes impregnable, and the law will not be changed, unless by legis-

lative enactment.    Where, however, there has been but
a single decision, which is clearly erroneous, and impor-
tant private or public rights are concerned, or where the
questionable matter was not necessarily involved in the
case or cases, òr where the points involved were decided
contrary to the well-established legal principles which
ought to have governed, and injustice or hardship would
result, or where it appears that the facts which impelled
the former decisions and the conditions under which they
were made were materially different from those in the
case under consideration, or where it is manifest that the
law has been erroneously decided, and no material prop-
erty rights or business rules have been established there-
under, the doctrine of *stare decisis* ought not to be applied,
so as to prevent a reconsideration of the former action of
the court.

Would it not be an open violation of the rule to declare
that a decision, however erroneous, however opposed to leg-
islative enactments or constitutional provision, is neverthe-
less conclusive evidence of the law, and that the courts make
the law as well as define its application?    That doctrine
is founded on public policy, and is the only practical one
respecting the weight and conclusiveness of judicial deci-
sions.    It is not an arbitrary rule of positive law, which
forbids any thought of questioning, under any circum-
stances, what has once been decided, or any judicial dis-
cretion in relation thereto.    It expresses our reverence for
civil authority, and our demands for obedience to such
authority, and presents the injunction that courts shall not
for light reasons abandon the principles announced under
solemn judgment, by their predecessors or themselves,
nor without due consideration of public and private inter-
ests, but the rule does not prevent the use of judicial
discretion, in a proper case, where the law has been mis-

conceived or violated; nor does it demand that what is not law shall become the law; rather it induces the court, if it has digressed from, to return to, well-established principles. Chancellor Kent, speaking on this subject, observed: "If judicial decisions were to be lightly disregarded, we should disturb and unsettle the great landmarks of property. When a rule has been once deliberately adopted and declared, it ought not to be disturbed, unless by a court of appeal or review, and never by the same court, except for very cogent reasons, and upon a clear manifestation of error; and if the practice were otherwise, it would be leaving us in a state of perplexing uncertainty as to the law. * * * But I wish not to be understood to press too strongly the doctrine of *stare decisis*, when I recollect that there are more than one thousand cases to be pointed out in the English and American books of reports, which have been overruled, doubted, or limited in their application. It is probable that the records of many of the courts in this country are replete with hasty and crude decisions; and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error. Even a series of decisions are not always conclusive evidence of what is law; and the revision of a decision very often resolves itself into a mere question of expediency, depending upon the consideration of the importance of certainty in the rule, and the extent of property to be affected by a change of it." 1 Kent's Com., 476, 477.

In *Callender's Admr.* v. *Keystone Mut. Life Ins. Co.*, 23 Pa. St., 471, where a previous decision was attacked on the ground that it was not supported by the cases on which it was based, Mr. Justice Lowry, delivering the

opinion and speaking of the duty of the court to correct errors when practicable, said: "Do we violate the doctrine of *stare decisis* by now correcting the mistake, and going back to the well-established doctrine which that case has disturbed? If we do, we commit a greater error than the one we have felt bound to correct; for that doctrine, though incapable of being expressed by any sharp and rigid definition, and therefore incapable of becoming an institute of positive law, is among the most important principles of good government. But like all such principles in its ideal, it presents its medial and its extreme aspects, and is approximately defined by the negation of its extremes." 23 A. & E. Enc. Law, pp. 36, 37; Wells Res., Adj. Secs. 589, 613; *Linn* v. *Minor*, 4 Nev., 462; *Pratt* v. *Brown*, 3 Wis., 532; *Bane* v. *Wick*, 6 Ohio State, 13; *McFarland* v. *Pico*, 8 Cal., 626; *Aud* v. *Magruder*, 10 Cal., 282; *San Francisco* v. *S. V. W. W.*, 48 Cal., 493; *Duff* v. *Fisher*, 15 Cal., 376; *Cluff* v. *Day*, 144 N. Y., 580; *Bird* v. *Seller*, 122 Mo., 23; *Railroad Co.* v. *Shoup*, 28 Kan., 281.

It will thus be seen from the foregoing considerations and authorities that the doctrine of *stare decisis* is not an inflexible rule, and that there are occasions where it becomes the duty of the court to re-examine questions involved, and again subject them to judicial scrutiny. Upon examination of the facts and conditions under which the cases cited by the respondent, and because of which he invokes that doctrine, were decided, it will become apparent that the rule can not be logically applied to the case at bar. Reference to those cases shows that four of them were decided by the territorial supreme court before the adoption of the constitution, and consequently none of the constitutional questions, hereinbefore considered, were involved; and the essential facts therein were materially

different from those herein. It is clear, therefore, that they can not be regarded as controlling precedents. The remaining one, the case of *Kaysville City* v. *Ellison*, 18 Utah, 163; 55 Pac. Rep., 386, was decided since the adoption of the constitution. Neither Sec. 5 nor Sec. 10, Art. 13, Const., were considered by the court, nor does it appear from the briefs in that case that attention was called to those sections. The court, however, did consider Sec. 22, Art. 1, Const., and held it to be a limitation upon the taxing power as well as upon the right of eminent domain, contrary to the views hereinbefore expressed. In construing this section, the court followed the case of *People* v. *Daniels*, 6 Utah, 288, which is one of the cases decided before statehood, and in support of its position that the constitutional provision, "private property shall not be taken or damaged for public use without just compensation," applies to taxation, cited *Bradshaw* v. *City of Omaha*, 1 Neb., 16, several Iowa and Kentucky cases, and *Wells* v. *City of Weston*, 22 Mo., 384. The Nebraska case, it appears, was overruled in *Turner* v. *Althans*, 6 Neb., 54. In the Missouri case, the court simply held that the Legislature of that State could not authorize a municipal corporation to tax, for its own local purposes, lands lying *beyond* the corporate limits. The law of Missouri respecting the subject of taxation appears to be in harmony with the views herein expressed. *Giboney* v. *City of Cape Giradeau*, 58 Mo., 141.

In reference to the Iowa and Kentucky cases, it may be said that while some of the decisions were made by very eminent judges, it seems difficult to harmonize them with the conceded principles which govern the law of taxation. They appear to be at variance with nearly if not quite all the other American courts. Observes Judge Cooley, in his work on Constitutional Limitations, on page 621 (6th

ed.) : "The rule of apportionment must be uniform throughout the taxing district, applicable to all alike; but the Legislatures have no power to arrange the taxing districts arbitrarily, and without reference to the great fundamental principle of taxation, that the burden must be borne by those upon whom it justly rests. The Kentucky and Iowa decisions hold that, in a case where they have manifestly and unmistakably done so, the courts may interfere and restrain the imposition of municipal burdens on property which does not properly belong within the municipal taxing district at all. It must be manifest, however, that the effect of the decisions in the States last referred to is to establish judicially two or more districts within a municipality where the Legislature has established one only; and as this is plainly a legislative function, it would seem that the Legislature must be at least as competent to establish them directly as any court can be to do the same thing indirectly." See also Cooley on Taxation, 158, 159. *Turner* v. *Althans, supra; Giboney* v. *City of Cape Giradeau, supra.*

Since the adoption of the new constitution by the State of Kentucky, with provisions respecting the subject of taxation very like those in our own constitution on the same subject (Secs. 171, 174, Ky. Const.), the supreme court of that State, in considering the precise question respecting the taxation by a municipality of agricultural land situate within its territorial limits, which had on numerous previous occasions been before that court, has declared the tax valid, and refused to follow the earlier decisions.

In *Board* v. *Rarick*, 43 S. W. R., 450, the court said: "It is our opinion, when taxes are imposed by municipalities, they shall be levied and collected on all property situated within the territorial limits of such municipali-

ties, except it be exempted from taxation in virtue of the provisions of the constitution. When taxes are imposed by proper authority in the State, county, or any subdivision thereof, or taxing district, they shall be levied and collected on all property situated within the territorial limits of the authority levying them, except it be exempted by the constitution. *Pence* v. *City of Frankfort*, 41 S. W. R., 1011; *Board* v. *Scott*, 42 S. W. R., 104.

Thus it will be observed that the supreme court of Kentucky is now in line with the almost uniform current of authority on the question of taxation. It will also be noticed upon examination that the principles announced in *Kaysville City* v. *Ellison* have no such support of authority as ought to prevent us from again considering the vexed questions, and upon finding we have digressed, from returning to the true and well-beaten path. Especially is this so since that decision is of recent date, and no business rule, or rule of property, has grown up under it, and no property rights will be disturbed thereby. The correctness of the judgment in the Kaysville case, in relating to municipal license, and the essential facts differing materially from those herein, is not necessary for us to discuss or decide.

We are of the opinion that the tax in question herein is valid, and that the court erred in restraining its collection. The judgment must therefore be reversed, with costs for this appeal, and the cause remanded with directions to the court below to set aside its decree, dissolve the restraining order, and enter a decree in favor of appellants.

It is so ordered.

We concur because of the provisions in the constitution.

MINER, J., BASKIN, J.